## Commonwealth *v.* Pearson, Appellant.

Argued April 18, 1967. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

46

*Jerold G. Klevit,* for appellant.

*James D. Crawford,* Assistant District Attorney,
with him *Alan J. Davis,* Assistant District Attorney,
*Richard A. Sprague,* First Assistant District Attorney,
and *Arlen Specter,* District Attorney, for Common-
wealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, September 26,
1967:

This appeal presents to our Court for the first time
a problem concerning the application of the new rule
on constitutional harmless error announced by the
Supreme Court of the United States in *Chapman v.
California,* 386 U.S. 18, 87 S. Ct. 824 (1967).

Appellant, Oscar E. Pearson, was charged with ag-
gravated robbery on eleven bills of indictment. After
a jury trial in the Court of Quarter Sessions of Phila-
delphia County, verdicts of guilty were returned on
all eleven bills; the trial judge imposed consecutive
five to ten year sentences on eight of the eleven indict-
ments, suspending sentence on the other three. On ap-
peal these convictions were affirmed per curiam by the
Superior Court, with Judges JACOBS and HOFFMAN dis-
senting.

Between November 5, 1963 and March 30, 1964, a
series of eleven armed robberies were committed in the
Philadelphia area. Of the actual perpetration of these
crimes there can be no doubt. Nor was there any doubt
that eight of them were committed by two men, one of

whom was Gilbert Martell. At the time of appellant's trial, Martell had already pled guilty to, and been convicted of, these crimes. The crucial issue posed at trial was the identity of Martell's accomplice. Although the Commonwealth assembled an impressive array of eyewitnesses, all of whom testified that they were robbed by the appellant, Martell himself was unwilling to identify Pearson unequivocally until cross-examined,[1] and even then could be forced to admit only that he had previously identified appellant's photograph. In order to buttress its case, the Commonwealth, over timely objection by defense counsel, introduced two wallets, allegedly taken from an apartment occupied by one T. B. Dixon. It was later shown that Dixon was in fact an alias, that Pearson was renting the apartment, and that the wallets belonged to victims of the robberies.

An agent of the Federal Bureau of Investigation testified that the appellant was arrested at a racetrack in Laurel, Maryland, and that after his arrest, other agents went to Pearson's rooming house in Baltimore, searched his room without a warrant, and discovered the wallets. In *Commonwealth v. Ellsworth*, 421 Pa. 169, 218 A. 2d 249 (1966), a similar search was held invalid on the theory that to be made without a warrant the search must have been incident to arrest, and that the procedure of arresting a defendant at point X, then searching his room at point Y, did not qualify as incident to the arrest. In light of *Ells-*

---

[1] Although Martell was called as a witness for the Commonwealth, the assistant district attorney was given permission to cross-examine him after successfully pleading surprise. The surprise was caused by the failure of Martell to positively identify Pearson in the courtroom. Permitting the Commonwealth to cross-examine its own witness was only one of several rulings of the court to which exception was taken by appellant. However, because of our resolution of the harmless error issue, we need not face appellant's other contentions.

*worth,* it is clear that the wallets should not have been admitted into evidence, a fact conceded by the Commonwealth on oral argument before this Court. Nevertheless it is now argued that the admission of the wallets did not prejudice appellant because of the substantial number of eyewitness identifications produced at trial, and that therefore the unconstitutional search resulted only in a harmless error. We do not agree.

In *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824 (1967), the Supreme Court of the United States recently announced the test for determining whether a violation of the Federal Constitution can be harmless. Mr. Justice BLACK, writing for the Court, stated the new test as follows: "We hold . . . that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24, 87 S. Ct. at 828. Moreover, the *Chapman* opinion makes it quite clear that in applying this test, the burden of proving that the error is harmless beyond a reasonable doubt rests with the prosecution.

Onto the bones of this somewhat cryptic "beyond a reasonable doubt" test, Mr. Justice BLACK grafted the holding of *Fahy v. Connecticut,* 375 U.S. 85, 84 S. Ct. 229 (1963). That case, at the time it was decided, was merely an application of Connecticut's harmless error rule and was not intended to announce a nationwide test. However, the *Chapman* opinion "adhere[s] to the meaning of . . . Fahy," and announces that "there is little, if any, difference between our statement in Fahy . . . about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24, 87 S. Ct. at 828. Therefore, as we read *Chapman* and

*Fahy,* in order to show that a constitutional defect is harmless error, the Commonwealth must now demonstrate, beyond a reasonable doubt, that there was no reasonable possibility that the evidence complained of might have contributed to the conviction. A careful study of the record in this appeal convinces us that the prosecution has not met this burden.

The Commonwealth argues strenuously that the error committed by the trial judge must be harmless because the rest of its case presented more than enough evidence to support a finding of guilt. This notion, that error is always harmless when it infects evidence which is merely cumulative, has been rejected not only by the Supreme Court, but by our own Superior Court as well. In *Fahy,* supra at 86, 84 S. Ct. at 230, it was said: "We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of." And in *Commonwealth v. Blose,* 160 Pa. Superior Ct. 165, 170-71, 50 A. 2d 742, 744-45 (1947), the court noted, quoting from Mr. Justice RUTLEDGE'S opinion in *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S. Ct. 1239, 1248 (1946) : " 'The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.' " Of course, we realize that the Commonwealth's case may be so overwhelming as to make the error harmless even under *Chapman;*[2] and in fact, had the wallets here been

---

[2] But see, Thompson, Unconstitutional Search and Seizure and The Myth of Harmless Error, 42 Notre Dame Law. 457 (1967). Although this article was written before *Chapman,* it is the author's thesis that under *Fahy* there can never be any harmless error involving an unconstitutional search and seizure. To some extent, this position is undermined by two cases decided since *Chapman* finding harmless error under the *Chapman* test, which is actually the same as *Fahy.* See, *People v. Hines,* 57 Cal. Rptr. 757, 425 P. 2d 557 (1967) (admission into evidence of an allegedly

50

merely introduced *once,* and not further commented upon, then the Commonwealth's harmless error argument might have had some merit. However, far from the mere *introduction* of the wallets it becomes apparent from the record that the Commonwealth, as well as the trial judge in his charge to the jury, caused this illegally seized evidence to become the most crucial element of the prosecution's case. Indeed, it can be said that the wallets were flaunted by the assistant district attorney.

The Commonwealth's case, in the main, consisted of placing the eleven victims on the stand to recount the holdups in which they were robbed. At the close of each description, the witness then testifying was asked to identify the robber, whereupon he or she pointed to the appellant. Because the methods used by the holdup man, as well as his description, were practically the same in every case,[3] it soon became apparent that the same man, whoever he may have been, was involved in all the robberies. For this reason, after the first few victims testified, it is quite probable that the jury had become convinced of appellant's guilt. In fact, to read the testimony of these eleven witnesses

involuntary confession held harmless since it was practically identical to an earlier voluntary confession); *State v. Pierson,* 102 Ariz. 90, 425 P. 2d 115 (1967) (alleged comment on defendant's failure to take the stand held harmless, although the opinion is unclear as to whether the court even agreed with the defendant that the comments were really *on* the failure to testify). Very few cases have been decided under *Chapman,* and our research has uncovered none involving illegally seized evidence.

[3] For example, in each case a cloth sack was used to collect the money, and one of the holdup men chained or wired the doors shut when he left, thus preventing the victims from pursuing them. Furthermore, the robberies were tied together by the fact that Martell was present in eight of them, and by the fact that each witness described the older man (alleged to be Pearson) as around 60 years of age, wearing a broad brimmed hat and a long overcoat.

is to be reminded of a broken record repeating the same few notes over and over again.

Apparently, the Commonwealth also realized the effect its case would have upon the jurors, and so, instead of presenting the victims in the order in which they were robbed, it strategically called as the first two witnesses the two victims whose wallets were found in Pearson's apartment.[4] In this way, the wallets would have the maximum effect upon a jury which was, at that time, probably more concerned with the identification of the appellant than with the description of the robberies themselves. Then, as the seemingly endless parade of witnesses continued, the natural tendency might be to become less and less interested in the eyewitness identification and more interested in hearing the description of a type of robbery with which this appellant could be connected.

If Pearson's fate was at least partially sealed by having the first two witnesses identify, as theirs, wallets taken from the appellant's apartment, that fate became all the more definite when these wallets were opened, and the cards inside catalogued one at a time before the jury. We can see no reason whatsoever for the Commonwealth's insistence that the contents of each card in both wallets be read into the record except to impress upon the jury that the wallets conclusively linked Pearson to the crimes.[5] Moreover, the

---

[4] The first witness called, Leon Magen, was the victim of the fifth robbery. The second witness, Alfred Berry, was robbed eighth. Each man identified his respective wallet immediately after pointing out Pearson as the man who robbed him.

[5] Illustrative of this cataloguing of cards is the following excerpt from the testimony of Leon Magen: "MR. BOGDANOFF: (Assistant District Attorney) Let the record indicate that the number of cards, the first one being an operator's license 1959, Leon Magen, with Mr. Magen's address. The second one is an operator's license 1960, Leon Magen and his address. The third one being operator's license 1961 and 1962, Leon Magen and his address. The

assistant district attorney was not satisfied by simply reading the cards into the record once. During the direct examination of the F.B.I. agent whose men searched Pearson's apartment, he again introduced the wallets, and this time asked the *agent* to read the cards found inside. Certainly, after such a display, the prosecution cannot be heard to say that there was no reasonable possibility that these wallets might have contributed to the conviction; and to argue that no such possibility existed *beyond a reasonable doubt* has even less merit.

What is perhaps the most disturbing aspect of this trial in general, and of the wallets in particular, comes not from the Commonwealth's case itself, but rather from the charge to the jury. In the *Blose* case, supra, it was argued, albeit unsuccessfully, that the error, committed when a witness was allowed to testify that a certain photograph of the defendant was a prison photograph, was rendered harmless when the trial judge instructed the jury to disregard that testimony. Yet here, far from cautioning the jury about the weight to be given the wallets, the trial judge actually singled out this evidence as worthy of its special consideration. To compound a trial error by emphasizing the tainted evidence in the jury charge would probably, by itself, be sufficient under *Chapman* to render the error not harmless.

It is indeed unfortunate that the Commonwealth so infected an otherwise strong case as to require this Court to reverse the decision below. However if the

next one is operator's license 1963 and 1964, Leon Magen and his address. The next one being a courtesy card of the Sheriff's Association of Camden County, New Jersey for the years 1963 to 1965. The next card being a courtesy card of the office of the sheriff of Atlantic City, Leon Magen, 1962-1965. The next card is—" At this point Mr. Bogdanoff was interrupted by a question from the bench. However, after answering the question, he continued the list, going through five more cards.

*Chapman* test is to have any vitality, such a result is compelled. We fully realize that on retrial a new jury may still, acting reasonably, convict the appellant; but we reiterate that this is not the test for harmless error. So long as there remains the reasonable possibility that a violation of appellant's constitutional rights might have contributed to his conviction, he must be granted a new trial free of such infirmities.

Judgment reversed and new trial granted.

Mr. Chief Justice BELL dissents.