329 A.2d 277
**COMMONWEALTH of Pennsylvania**
v.
**Gregory Aaron THOMAS, Appellant
(two cases).**

Supreme Court of Pennsylvania.
Argued Nov. 26, 1973.
Decided Nov. 20, 1974.

A. Charles Peruto, B. A. Rose, Harold Diamond, Philadelphia, for appellant.

Arlen Specter, Dist. Atty., Richard A. Sprague, 1st Asst. Dist. Atty., David Richman, Asst. Dist. Atty., Chief, Appeals Div., Benjamin H. Levintow, Asst. Dist. Atty., Philadelphia, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

NIX, Justice.

This appellant, after trial by jury, was convicted of murder in the first degree, aggravated robbery and several other offenses which are not presently before us. After post-trial motions were dismissed by a court en

banc and the imposition of sentence [1], the judgment of sentence under the murder indictment was appealed directly to this Court, Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202, 17 P.S. § 211.202(1) (Supp.1974–75); the appeal from the sentence imposed on the aggravated robbery indictment was first had to the Superior Court. By order of this Court the appeal to the Superior Court was certified to this Court and consolidated with the pending appeal on the murder charge for argument and disposition. Act of July 31, 1970, P.L. 673, No. 223, art. V, § 503, 17 P.S. § 211.503(c) (Supp.1974–75).

Turning first to appellant's contention that the evidence was insufficient to support the verdicts, a review of the record convinces us that the claim is without merit. The testimony established that at or about 2:30 P.M. on January 17, 1970, the deceased, a driver-salesman for a meat concern, while in the process of discharging the duties of his employment, was accosted by two men. During the course of an attempted robbery the victim received a gunshot wound to the abdomen which resulted in his death. A seventeen-year-old youth testified that while he was standing waiting for a friend, he observed the incident. He stated that two men, one whom he identified as Michael Townsell [2] and another whom he could not identify, attempted to rob the victim; that Michael Townsell was "tussling" with the victim inside the truck while the other man stood outside the truck; and that Michael stepped out of the truck and the other individual entered the vehicle when the witness heard a

1. A sentence of life imprisonment was imposed under the murder indictment and a term of imprisonment of from ten to twenty years to run consecutively with the life sentence was imposed under the aggravated robbery indictment. Appellant was also convicted of several weapon offenses and conspiracy for which sentences were suspended.

2. Michael Townsell was tried separately and his conviction was affirmed by this Court. *Commonwealth v. Townsell*, 457 Pa. 249, 320 A.2d 111 (1974).

"pop". As the two men fled the scene they passed the witness who observed the man he could not identify placing a gun inside his pants. The victim fell out of the truck and after regaining his footing entered a store holding his stomach and stated "I've been shot, call the police." After leaving the store he collapsed on the highway where he was found by police.

The Commonwealth then produced a number of appellant's associates to establish that he [appellant] was the other man who participated in the robbery.[3] Bernice Wilson, who lived within a block of the scene, was approached by appellant on the street and directed by him to go into the backyard of her home, look under a box and pick up "what was there and take it in the house". Complying with the request Bernice immediately returned to her home, went to the rear yard and discovered a gun in the place she had been instructed to look. She re-entered her home and secreted the gun on a shelf in the cellar.

Lloyd Milton Wilson, the brother of Bernice, was in his home with Anthony Gwaltney and Michael Townsell when appellant entered and "asked me [Milton] for his piece". When Milton responded that he did not know where it was, appellant stated that Bernice knew "because he gave her the gun". Milton went upstairs and advised Bernice of appellant's request, whereupon Bernice directed the group to the cellar where the weapon was retrieved. Appellant placed the gun inside his belt and left the home.

Another friend of appellant, Michael Grant, testified that on the afternoon in question the appellant approached him and asked him to keep a .22 caliber black pistol. During this conversation, appellant told Grant that he had just shot a man. When Grant expressed

---

**3.** The sole theory of the defense was that appellant did not participate in this robbery-murder.

378

disbelief, appellant told Grant to watch the news on television that evening.

We have repeatedly stated that the test of sufficiency of evidence is whether, accepting as true all the evidence and all reasonable inferences therefrom, which if believed, the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime or crimes of which he has been convicted. *Commonwealth v. Chasten,* 443 Pa. 29, 275 A.2d 305 (1971) ; *Commonwealth v. Williams,* 432 Pa. 557, 248 A.2d 301 (1968); *Commonwealth v. Finnie,* 415 Pa. 166, 202 A.2d 85 (1964) ; *Commonwealth v. Burns,* 409 Pa. 619, 187 A.2d 552 (1963) ; *Commonwealth v. Kravitz,* 400 Pa. 198, 161 A.2d 861 (1960). Moreover, the evidence must be viewed in a light most favorable to the Commonwealth, the verdict winner, and the Commonwealth is entitled to all reasonable inferences arising from the evidence. *Commonwealth v. Rankin,* 441 Pa. 401, 272 A.2d 886 (1971) ; *Commonwealth v. Ingram,* 440 Pa. 239, 270 A.2d 190 (1970).[4] Reviewing the record, in light of the aforementioned principles, we are satisfied that the evidence presented to the jury was more than sufficient to sustain their verdicts.

The second assignment of error to be considered is whether the trial court committed reversible error with reference to his rulings relating to the testimony of the Commonwealth's witness, Anthony Gwaltney. The appellant claims prejudicial error occurred when the prosecution was permitted to impeach one of its own witnesses. Appellant further argues that the initial error [the allowance of a plea of surprise] was compounded by the latitude of cross-examination permitted.

4. The appellant would have us consider also the weight of the evidence. It has, however, long been the law that the jury may believe all or only a part of or reject all of a witness' testimony, and so long as the verdict is supported by the evidence there is no basis for an appellate court to intrude upon the fact-finding function of the jury. *Commonwealth v. Neal,* 447 Pa. 452, 290 A.2d 922 (1972).

The fundamental rule in this jurisdiction is that it is within the sound discretion of the trial court to decide whether counsel may exercise the right of cross-examination of his own witness. *Commonwealth v. Dancer*, 452 Pa. 221, 305 A.2d 364 (1973). In recent years this Court has announced several principles for the trial courts to follow in the exercise of this discretion. First, before counsel may cross-examine his own witness on a plea of surprise the testimony given by the witness must be unexpected. *Commonwealth v. Turner*, 389 Pa. 239, 133 A.2d 187 (1957):

> " 'Generally, to entitle the party calling the witness to relief from the situation caused by the witness's adverse testimony, it is essential that such party be really surprised by such testimony.' . . . Surprise, in its legal connotation, does not embrace disappointment or a feeling of frustration on the part of the one seeking to have a witness testify otherwise than he has indicated he will do." Id. at 253–254, 133 A.2d at 193.

Secondly, the testimony of the witness must be contradictory to statements the witness had made earlier. *Commonwealth v. Bynum*, 454 Pa. 9, 309 A.2d 545 (1973); *Commonwealth v. Tucker*, 452 Pa. 584, 307 A.2d 245 (1973); *Commonwealth v. Dancer*, 452 Pa. 221, 305 A.2d 364 (1973); *Commonwealth v. Stafford*, 450 Pa. 252, 299 A.2d 590 (1973); *Commonwealth v. Knudsen*, 443 Pa. 412, 278 A.2d 881 (1971). Thirdly, the testimony must be hurtful or injurious to the party calling the witness and beneficial to the opposing side. *Commonwealth v. Bynum, supra; Commonwealth v. Tucker, supra; Commonwealth v. Dancer, supra; Commonwealth v. Stafford, supra; Commonwealth v. Knudsen, supra; Commonwealth v. Turner, supra.*

> " 'Since the purpose of the cross-examination and impeachment is then, to induce the injury to *disbelieve* the testimony of the witness—there must be something in the witness' testimony, which if not disbelieved by

the jury will be hurtful or injurious to the party calling him. Were it otherwise there could be no occasion to discredit or impeach the witness or to stamp him as unworthy of belief.' " *Commonwealth v. Turner*, 389 Pa. at 254, 133 A.2d at 194.

Fourthly, the scope of the cross-examination may not be excessive. *Commonwealth v. Tucker, supra.* The end sought to be achieved by permitting cross-examination of a witness by the party calling him is to allow an opportunity to dispute those unexpected adverse statements made by that witness by showing to the jury that he stated otherwise on a prior occasion. The prior statement is not admitted as substantive testimony but for the limited purpose of establishing the inconsistency. Thus, where this device is used to introduce additional facts which the witness did not specifically controvert no permissible evidentiary purpose is served and such practice will not be tolerated.

Lloyd Milton Wilson was called by the Commonwealth and testified to the presence of his sister Bernice, Anthony Gwaltney, and Michael Townsell, appellant's co-conspirator, at his home shortly after the subject robbery-murder. Upon the arrival of the appellant, at the Wilson home he requested his "piece" [revolver], which he stated he had given to Bernice. Accompanied by all present, Wilson's sister directed Wilson to the location of the weapon, which she had secreted in the cellar of their home. Upon finding the gun the appellant placed the weapon in his belt and left the Wilson home.

The Commonwealth next called upon Anthony Gwaltney to corroborate Wilson's testimony as to the appearance of the appellant in the Wilson home, his request for the weapon, and his subsequent departure with the object. Gwaltney had previously given to the police a full statement in which he had related the occurrence substantially similar to Wilson's version of the incident.

Moreover, he had testified to these matters at the trial of appellant's co-conspirator, Michael Townsell. When called to the stand on this occasion the following transpired:

"A. I don't remember.

Q. What did he say?

A. I don't remember.

Q. Oh, you don't remember?

A. No.

Q. All right. Gregory comes in. Did you have a conversation?

. . . . . . . .

Q. Did a conversation take place between you and Townsell, Gregory and Milton?

A. No.

Q. It didn't, huh?

A. No.

Q. What did you do?

A. Didn't do nothing.

Q. You didn't do nothing?

A. No.

Q. What did you do in the house?

A. We were sitting in the front.

Q. Yes?

A. I don't remember anything else.

Q. You don't remember anything else? You don't remember going down the cellar?

A. No.

Q. You don't?

A. No.

Q. You don't remember going down the cellar?

A. No.

Q. No?

A. No.

Q. You don't remember that? Do you remember anything about a gun?

A. No.

Q. You don't remember that, either, do you?·

A. No.

Q. Do you remember anything about Gregory saying anything about what happened at 61st and Market Street?

A. No." [5]

We cannot accept appellant's argument that the thrust of Gwaltney's testimony was limited to an assertion that he did not recall the conversation and events of the time in question. A fair reading of the pertinent testimony, set forth above, reflects at least a clear denial of the occurrence of the conversation described by Wilson.[6] It was therefore proper for the court to permit cross-examination of Mr. Gwaltney on the issue regarding the occurrence of that conversation. Unquestion-

---

5. The record shows that following the above colloquy there was a side-bar conference between counsel and the court. Thereafter, the attorney for the prosecution withdrew his plea of surprise and made a further attempt to cause the witness to recall his former testimony. This effort proving unsuccessful, the trial judge thereupon excused the jury and permitted counsel for the prosecution to question the witness extensively from the earlier statement in another unsuccessful attempt to refresh his recollection. It was at that point that the court proceeded to summon the jury and permitted the prosecution to cross-examine its witness.

6. With reference to the issue as to whether Gwaltney, categorically denied going to the cellar, we are of the opinion that he did not. While the following series of questions and answers may have suggested a denial: "Q. What did you do? A. Didn't do nothing. Q. You didn't do nothing? A. No.", these answers were subsequently followed by the following questions and answers which in our judgment indicate the lack of recollection rather than an assertion of fact: "Q. What did you do in the house? A. We were sitting in the front. Q. Yes? A. I don't remember anything else. Q. You don't remember anything else? You don't remember going down the cellar? A. No."

ably, the prosecution was surprised by the unexpected contradiction of Gwaltney's prior statements to the police and his sworn testimony at the co-defendant's trial. Furthermore, in contradicting Mr. Wilson's testimony, Gwaltney's testimony was injurious to the Commonwealth and benefited the defense. However, cross-examination beyond the denial of the occurrence of the conversation was improper and should not have been permitted. The only harm to the Commonwealth's case was the denial that the conversation, in fact, took place. The effect of the witness's failure to recall, when questioned, other events was neither helpful nor harmful, but simply neutral. We have held that lapse of memory alone is not sufficient to justify cross-examination of one's own witness because it does not aid the opposing party. *Commonwealth v. Stafford*, 450 Pa. 252, 256, 299 A.2d 590, 594 (1972); *Commonwealth v. Knudson, supra* at 414–415, 278 A.2d at 882–883. Here the prosecutor, as noted by Judge Chalfin,[7] went far beyond the conversation and attempted to elicit other information detrimental to the defense contained in his earlier statements.[8]

However, our conclusion that the cross-examination exceeded permissible limits does not end the inquiry. The Commonwealth claims that even if erroneous, the cross-examination of Gwaltney was harmless. We agree. The court's cautionary instructions,[9] the wit-

---

7. Judge Chalfin, a member of the court en banc, filed a separate concurring opinion in which he found the scope of cross-examination to be excessive but concurred in an affirmance after determining the error to be harmless.

8. Although the Commonwealth argues that appellant waived objection to the scope of the examination, we do not agree. The record indicates that the defense requested that the cross-examination be limited. Moreover, Judge Chalfin's opinion is further indication that the issue was presented below.

9. The judge instructed the jury as follows:
   "Now, during the course of his [Gwaltney's] testimony he was asked questions by the District Attorney: Do you remember

ness's persistence in his inability to recall the events, as well as the overwhelming evidence of guilt convince us that the error was harmless. See *Commonwealth v. Dancer, supra,* 452 Pa. at 227, 305 A.2d at 364. See also *Commonwealth v. Stafford, supra,* 450 Pa. at 256, 299 A.2d at 594, and *Commonwealth v. Knudson, supra,* 443 Pa. at 415–416, 278 A.2d at 884. Cf. *Commonwealth v. Tucker, supra,* at 591, 307 A.2d at 250.

Finally, appellant contends that the prosecutor committed reversible error in referring to witness Gwaltney and the defendant as "bums". During the questioning of Gwaltney the following appears:

"Q. And you have known him (appellant) all your life?

A. Yeah.

Q. Yeah. And on direct examination, before I started to cross-examine you, you didn't remember how long you knew him, and now you do remember you knew him all your life. He's a friend of yours, isn't he?

A. Yeah.

Q. He's a bum, just like you are, isn't he?

this and that. To which, as I recall it, the witness responded that he did not remember.

Now, the questions that were asked the witness are not to be considered by you at all, because they are not evidence. The witness did not say that that occurred, or it did not occur. He said he doesn't remember.

So, therefore, you will examine only the testimony of Mr. Gwaltney insofar as it is what he said. If he said he didn't remember, then you will accept, he didn't remember. Or if he said he didn't remember and offered no more than that, then you could read no more than that into it.

Therefore I instruct you that the testimony of Mr. Gwaltney is to be considered only from what he himself said, and not from questions that were propounded to him by the District Attorney.

You will examine his testimony and utilize it for or against the defendant as you see fit but only that testimony that he himself gave and not questions that were asked of him."

THE COURT: Sir, I must caution you. That is highly improper.

MR. WATKINS: Yes, sir. Excuse me."

Although this reference was highly improper, no objection was taken nor was there a request for mistrial.

In *Commonwealth v. Brooks,* 454 Pa. 75, 309 A.2d 732 (1973), this Court refused to grant relief in similar circumstances because of an absence of a timely objection. Here, sua sponte, the trial judge attempted to alleviate the effect of the remark by immediately cautioning counsel. We again caution counsel for the Commonwealth:

"This Court has repeatedly recognized that the prosecutor's unique position as both an administrator of justice and an advocate gives him a responsibility not to be vindictive or attempt in any manner to influence the jury by arousing their prejudices. *Commonwealth v. Potter,* 445 Pa. 284, 285 A.2d 492 (1971); *Commonwealth v. Toney,* 439 Pa. 173, 266 A.2d 732 (1970); *Commonwealth v. Meyers,* 290 Pa. 573, 139 A. 374 (1927). In *Commonwealth v. Cicere,* 282 Pa. 492, 495, 128 A. 446, 447 (1925), we stated that 'the district attorney is a quasi-judicial officer, representing the Commonwealth, which seeks no victims, but only justice; . . .'". *Commonwealth v. Revty,* 448 Pa. 512, 516, 295 A.2d 300, 302 (1972).

See also *Commonwealth v. Lipscomb,* 455 Pa. 525, 528, 317 A.2d 205, 207 (1974) quoting *Commonwealth v. Capalla,* 322 Pa. 200, 185 A. 203 (1936) where we said: "expressions of personal belief . . . have no legitimate place in a district attorney's argument. . . . It is no part of a district attorney's duty, and it is not his right, to stigmatize a defendant."

The judgment of sentence is affirmed.

EAGEN, J., concurs in the result.

ROBERTS and MANDERINO, JJ., filed dissenting opinions.

JONES, C. J., took no part in the consideration or decision of this case.

ROBERTS, Justice (dissenting).

The majority concludes that "the prosecutor . . . went far beyond [the permissible scope of cross-examination] and attempted to elicit other information detrimental to the defense . . . ." Ante at 283. It holds, however, that the error was harmless. With the latter I cannot agree.

On this record, I am unable to "declare a belief that [the error] was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Commonwealth v. Pearson,* 427 Pa. 45, 48, 233 A.2d 552, 554 (1967). See especially *Commonwealth v. Tucker,* 452 Pa. 584, 589–591, 307 A. 2d 245, 248–249 (1973); see also *Commonwealth v. Bynum,* 454 Pa. 9, 12–13, 309 A.2d 545, 547 (1973); *Commonwealth v. Dancer,* 452 Pa. 221, 228–229, 305 A.2d 364, 367–368 (1973) (dissenting opinion of Roberts, J., joined by Nix & Manderino, JJ.); *Commonwealth v. Knudsen,* 443 Pa. 412, 416, 278 A.2d 881, 884 (1971) (dissenting opinion of Roberts, J., joined by Eagen, J.). The only evidence directly implicating appellant other than the improperly admitted statement of Anthony Gwaltney, who reported incriminating admissions made by appellant, was the testimony of Michael Grant. Grant testified that appellant had told him that he had shot a man in the back of a meat truck. However, Grant's credibility was seriously beclouded by his admission under cross-examination that he had lied to the police when initially questioned about the murder of Burkhard. If Grant's testimony had not been corroborated by the improperly admitted statement of Gwaltney, "honest,

fair-minded jurors might very well have brought in not-guilty verdicts." *Chapman v. California,* supra, 386 U.S. at 26, 87 S.Ct. at 829.

Because "there is a reasonable possibility that the improperly admitted evidence contributed to the conviction," *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972); *Commonwealth v. Pearson,* supra, I would reverse the judgment of sentence and remand for a new trial.

MANDERINO, Justice (dissenting).

The majority properly holds that error occurred when the prosecution, while impeaching one of its own witnesses, exceeded the permissible latitude of cross-examination. I must dissent, however, from the majority's conclusion that this error was harmless.

The majority opinion contains two diametrically opposed and irreconcilable views. On the one hand, the majority properly points out that "there is no basis for an appellate court to intrude upon the fact-finding function of the jury." The appellant is told: "the jury may believe all or only a part of or *reject* all of a witness' testimony . . . ." (Emphasis added.) The majority then proceeds, by some unexplained process of divination, to say that the improperly admitted evidence did not harm the appellant because the jury *accepted* as truthful the testimony of all other witnesses.

How can this Court have such knowledge? None of us was present in the jury room. No member of this Court can make a judgment as to the credibility of any witness. We were not on trial. We did not see or hear any witness. We do not know who was nervous, who stared at the ceiling, who failed to look directly into the eyes of the examiner, who dropped voice volume in answering a crucial question, or who manifested any of the unlimited

variations of human conduct which the law sums up in the phrase *demeanor of the witness*. We possess no formula to determine when the demeanor of the witness manifests truthfulness or lying. Each juror makes that judgment, consciously or unconsciously, based on his or her own formula gained through his or her own personal experiences.

The jury might have *rejected* the testimony of Lloyd Milton Wilson had that testimony not been properly corroborated by the inadmissible introduction of the out of court statements of Anthony Gwaltney. We don't know whether they would have or not. Because we don't know what evidence the jury accepted and what evidence it rejected, we have no way of knowing if that evidence which the jury did accept was "overwhelming." Since we cannot know whether the evidence accepted by the jury was "overwhelming," our determination of whether the error was harmless, as defined in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, reh. den., 386 U.S. 987, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), must be made by focusing on the prejudicial impact that the error had on the jury. If in the context of the entire trial, we can declare that this prejudicial impact was so insignificant that it is clear beyond a reasonable doubt that the error did not contribute to the jury's verdict, then such error is harmless. If, on the other hand, the erroneously admitted testimony influenced the jury to accept as true other, properly admitted, evidence, it has had a significant impact on the jury's fact finding process, and cannot be declared harmless beyond a reasonable doubt even though we later label the properly admitted evidence as "overwhelming."

For these reasons I must reject the majority's conclusion that an error, highly prejudicial to the appellant, was harmless because the evidence that *might have been accepted* by the jury was "overwhelming." The majority should have followed its own admonition: "There is *no*

*basis* for an appellate court to intrude upon the fact finding function of the jury." (Emphasis added.)

The judgment of sentence should be reversed and a new trial awarded.