759 A.2d 1273

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Thomas H. KIMBELL, Jr., Appellant.**

Supreme Court of Pennsylvania.

Argued March 7, 2000.

Decided Oct. 19, 2000.

Thomas W. Leslie, New Castle, for Thomas Hughes Kimbell, Jr.

Matthew Mangino, New Castle, for Com.

Amy Zapp, Robert A. Graci, Harrisburg, for Office of Attorney General.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

ZAPPALA, Justice.

This is a direct appeal pursuant to Section 9711(h) of the Judicial Code, 42 Pa.C.S. § 9711(h), which provides for automatic review following the imposition of the death penalty. On May 8, 1998, Thomas Kimbell, Jr. was convicted on four charges of first degree murder in connection with the stabbing deaths of Bonnie Dryfuse, her two daughters, 7 year-old Jacqueline Dryfuse and 4 year-old Heather Dryfuse, and her niece 5 year-old Stephanie Herko, at the Dryfuse home in Lawrence County. After the penalty hearing, the jury imposed death sentences for the murders of the three girls. Kimbell was sentenced to life imprisonment for the murder of Bonnie Dryfuse. On May 18, 1998, Kimbell filed a post-sentence motion for judgment of acquittal or, alternatively, for a new trial. The Lawrence County Court of Common Pleas denied his motion on February 11, 1999.

Kimbell presents eight issues on appeal; however, we will only address the issue of whether the trial court erred in

refusing to allow defense counsel to cross-examine Mary Herko, the mother of victim Stephanie Herko. Mary Herko was called as a defense witness at trial. For the following reasons, we find that the trial court erred in denying defense counsel the opportunity to cross-examine the witness. Accordingly, the judgments of sentence must be vacated and the matter remanded for a new trial.[1]

On June 15, 1994, the bodies of Bonnie, Jacqueline and Heather Dryfuse and Stephanie Herko were discovered in the Dryfuse mobile home at 100 Ambrosia Road in Pulaski Township, Lawrence County shortly after 3:00 p.m. Tom Dryfuse, Bonnie's husband and the father of Jacqueline and Heather, testified at trial that he was with his father on the day of the murders until he returned home after 3:00 p.m. Bonnie Dryfuse's body was found lying on the kitchen floor; the girls' bodies were found together in a bathroom. The victims sustained multiple stab wounds and their throats had been slashed with a knife. Tom Dryfuse, who was also known as Jake, made a phone call to a friend, then called 911. Police officers responded to the call and arrived at the scene.

1. Kimbell has raised additional issues, including (1) whether he was denied his state and federal constitutional protections against self incrimination when he was questioned by police in the psychiatric ward of a hospital without being informed of his *Miranda* rights; (2) whether he was denied his state and federal constitutional rights when he was arrested and given *Miranda* warnings on a completely unrelated theft charge but was subsequently questioned without further warnings in regard to a multiple homicide case; (3) whether the testimony of a police officer stating that he had seen the defendant with a small knife at some unspecified time in the past was admissible in the homicide prosecution; (4) whether a photograph of the blood-covered bodies of three small children was inflammatory and highly prejudicial and admitted in violation of his rights; (5) whether a particularly gruesome photograph, determined by the court to be inflammatory, was admissible for the purpose of permitting the jury to speculate in the absence of scientific evidence about intermingled blood; (6) whether the trial court erred in answering no in response to the jury question, Is all testimony given by an expert to be believed as fact?; and (7) whether the evidence was sufficient to sustain a conviction for first degree murder.

We will not address the merits of these issues since our determination that defense counsel was improperly precluded from cross-examining Mary Herko necessitates the grant of a new trial.

The Commonwealth presented evidence that Kimbell resided in a trailer park that was located within a short distance of the Dryfuse mobile home. Several witnesses testified that they had seen Kimbell in close proximity to the Dryfuse home before the bodies were found. Other witnesses testified that Kimbell had made statements to them admitting his involvement in the crimes.

Tom Dryfuse testified at trial that when he found the girls' bodies in the bathroom, he thought he had observed movement of Heather's eyelids and believed that Heather was still alive at the time. He testified that Heather was the only child whom he touched after finding the bodies. Dryfuse's testimony was inconsistent, however, with the testimony of one of the Commonwealth's forensic experts, who testified on cross-examination that blood found on the right hand of Tom Dryfuse was a genetic match for that of his daughter Jacqueline, not his other daughter Heather.

In addition to the forensic evidence demonstrating that the blood of one of the victims whom Tom Dryfuse denied touching was found on his hand, defense counsel was aware of a statement given to the police a year after the murders by Mary Herko that indicated that Tom Dryfuse was at the victims' home shortly before the murders occurred. Mary Herko, the mother of victim Stephanie Herko, had given a statement to the Pennsylvania State Police indicating that she was speaking on the telephone with Bonnie Dryfuse around 2:00 p.m. on the day of the homicides. Herko indicated that the conversation ended at about 2:20 p.m. after Bonnie Dryfuse stated that she had to go because Jake (Tom Dryfuse) had just pulled in.

The Commonwealth did not call Mary Herko as a witness at trial. She was called as a witness by defense counsel, as the statement would place Tom Dryfuse at the scene of the homicides forty minutes before the time that he testified to arriving at home.

On direct examination by defense counsel, Herko testified that on the afternoon of the murders, she had spoken by

telephone with Bonnie Dryfuse and that just before hanging up, Mrs. Dryfuse had said, I got to go, somebody just pulled up in the driveway. Defense counsel then sought to question her about her prior statement to the State Police. The prosecutor objected on the ground that defense counsel was seeking to impeach his own witness. The objection was sustained and defense counsel was not permitted to question Herko about the prior statement.

Kimbell asserts that the trial court abused its discretion in refusing to allow defense counsel to cross-examine his own witness about her prior statement to the State Police, which placed a specific person at the scene of the homicide at the time the crimes appeared to have been committed, where her testimony at trial indicated only that an unidentified person was at the scene. He contends that the prior statement was significant because it was exculpatory as to him and cast serious doubt on the alibi of Tom (Jake) Dryfuse. Kimbell asserts that the refusal of the trial court to permit further questioning of the witness with regard to her prior statement denied him the opportunity to place the last words of Bonnie Dryfuse before the jury, words that indicated that another person was at the scene at the time of the homicides, and that those words could have had an impact on the jury's verdicts by creating a reasonable doubt as to his guilt. He argues that the interests of truth and justice require that he be given the opportunity to cross-examine Mary Herko as to her prior statement.

The Commonwealth responds that the trial court's determination that Kimbell would not be permitted to cross-examine Herko was well reasoned and justified. It asserts that the trial court faithfully applied the multi-step analysis of the decisional law of the appellate courts to guide the exercise of its discretion in concluding that the traditional requirements for permitting Kimbell to cross-examine his witness were not met. The Commonwealth maintains that the trial court's ruling was within the bounds of its discretion.[2]

2. The Commonwealth also asserts that the prior statement made by Mary Herko would not have been admissible as substantive evidence

We observe at the outset that the Pennsylvania Rules of Evidence adopted by this Court on May 8, 1998 specifically address the impeachment of a witness. Pa. R.E. 607, relating to impeachment of a witness, states: [3]

(a) Who May Impeach

The credibility of any witness may be attacked by any party, including the party calling the witness.

(b) Evidence to Impeach

The credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these Rules.

The effective date of the Rules of Evidence was October 1, 1998, however. At the time of trial in April of 1998, the rules had not gone into effect and did not govern this proceeding.

We must examine, therefore, the common law principles that guided the trial court's decision that defense counsel would not be permitted to cross-examine his own witness. Under common law, it was within the sound discretion of the trial court to decide whether counsel could exercise the right of cross-examination of his own witness. *Commonwealth v. Dancer*, 452 Pa. 221, 305 A.2d 364 (1973). We review the trial court's ruling to determine whether there has been an abuse of discretion.

pursuant to *Commonwealth v. Brady*, 510 Pa. 123, 507 A.2d 66 (1986), and *Commonwealth v. Lively*, 530 Pa. 464, 610 A.2d 7 (1992), discussed infra, because it lacked the requisite reliability and trustworthiness. The issue of whether the prior statement could be used as substantive evidence was foreclosed by the trial court's ruling that the witness could not be cross-examined regarding the statement. Whether the statement, had it been introduced, could have been used only to impeach the credibility of the witness or as substantive evidence was not at issue, and any discussion thereof would be merely dicta.

3. The commentary to Pa. R.E. 607 provides that

Pa. R.E. 607(a) abolishes completely the common law rule that prohibited a party from impeaching a witness called by that party. The common law rule, which applied to all forms of impeachment, has been criticized. *See Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); 3A Wigmore, *Evidence* §§ 897–99 (Chadbourn rev.1970); McCormick, *Evidence* § 38 (4 th ed.1992). To the extent that there are any vestiges of the no impeachment prohibition remaining in Pennsylvania, Pa. R.E. 607(a) sweeps them away.

In *Commonwealth v. Gee*, 467 Pa. 123, 354 A.2d 875 (1976) (plurality opinion), we discussed the historical underpinnings of the common law rule.

The origins of the rule that ordinarily a party cannot impeach the testimony of a witness he himself has called is shrouded in historical obscurity. It is generally thought to be a relic of the primitive time when parties were not supported by witnesses in the modern sense of the word, but by oath-helpers whose function was not to attest to facts but the purely partisan one of swearing for the party calling them. See 3A Wigmore, Evidence § 896 (Chadbourn rev. 1970). Since these oath-helpers were ordinarily chosen by the party from among his own relatives, friends, or adherents and countered by similar oath-helpers representing the other side, it was thought appropriate to regard each party as vouching for the credibility of his own witnesses and bound by what they affirmed. Courts have long recognized, however, that a strict application of the ancient voucher rule under the conditions of modern jurisprudence can lead to injustice, and so they have articulated and developed a number of exceptions to the rule, usually without questioning whether the rule itself remains a valid one.

354 A.2d at 880 (footnote omitted).

As strict application of the general rule that ordinarily a party cannot impeach the testimony of its own witness proved unworkable, the rule was "considerably relaxed to prevent injustice and the tendency of the courts [has been] to permit parties to show the truth without strict regard to technicalities. . . ." *Commonwealth v. Smith*, 424 Pa. 544, 227 A.2d 653, 655 (1967), quoting *Commonwealth v. Gomino*, 200 Pa.Super. 160, 188 A.2d 784 (1963) (emphasis deleted).

Several guidelines developed to assist the trial courts in the exercise of their discretion. In *Commonwealth v. Thomas*, 459 Pa. 371, 329 A.2d 277 (1974) (plurality opinion), we summarized those guidelines where a party pleads surprise in order to cross-examine his own witness. In order for a party to cross-examine his own witness under such circumstances the following requirements were to be demonstrated: (1) the

testimony given by the witness must be unexpected; (2) the testimony must be contradictory to statements the witness had made earlier; (3) the testimony must be hurtful or injurious to the party calling the witness and beneficial to the opposing side; and (4) the scope of cross-examination may not be excessive. 329 A.2d at 281. *See also Commonwealth v. Barber*, 275 Pa.Super. 144, 418 A.2d 653, 657 (1980).

In *Thomas*, we discussed pleas of surprise by a party who wishes to cross-examine his own witness.

> Generally, to entitle the party calling the witness to relief from the situation caused by the witness's adverse testimony, it is essential that such party be really surprised by such testimony.... Surprise, in its legal connotation, does not embrace disappointment or a feeling of frustration on the part of the one seeking to have a witness testify otherwise than he has indicated he will do.

329 A.2d at 281, citing *Commonwealth v. Turner*, 389 Pa. 239, 133 A.2d 187, 193 (1957).

The legal connotation of surprise proved to be remarkably elastic, however. The meaning of surprise began to expand beyond that articulated in *Thomas* as prosecutors and defense counsel found themselves faced with the difficulties posed by calling crucial witnesses in criminal proceedings as their own witnesses.

The definition of surprise evolved as the courts addressed the practical problems faced in the courtroom. In *Commonwealth v. Kinnard*, 230 Pa.Super. 134, 326 A.2d 541 (1974), the trial court permitted the Commonwealth to cross-examine its own witness (a co-defendant) about prior inconsistent statements memorialized in a typed, signed statement given by the witness prior to trial. The statement of the witness indicated that the defendant was present at the crime scene; however, the witness testified at trial that the defendant was not at the scene. The Superior Court found that the trial court had not abused its discretion by permitting the Commonwealth to cross-examine its own witness regarding the inconsistent statement because it did not have actual knowledge that the

witness would not testify in accordance with his prior statement.

> The record shows that the prosecuting attorney never spoke at any time with the witness Cole before trial, but assumed (reasonably so, we find) that Cole would testify in accordance with the statement that he, Cole, had given to the police eleven days after the commission of the crime.

326 A.2d at 544.

The concept of surprise as the absence of actual knowledge of the witness' intention to change his or her statements at trial was eventually replaced with a more expansive view of surprise. In *Commonwealth v. Filer*, 249 Pa.Super. 349, 378 A.2d 330 (1977), a witness gave a statement to police that the defendant had taken the victim of a sexual assault into a bathroom, and when the witness sought to accompany the victim, the defendant pushed her out and locked the door. The witness told the police that, after coming out of the bathroom, the victim told her she had been raped by the defendant. Prior to trial, the witness informed the district attorney that she intended to recant her statement. The witness did in fact recant her statement to police at trial; the district attorney pled surprise and was allowed to cross-examine the witness.

The defendant asserted that the Commonwealth was not surprised as notice had been given by the witness of her intention to recant her original statement. Noting that the general rule that a party cannot impeach his own witness had been under attack, the Superior Court found that the trial court did not abuse its discretion in allowing the Commonwealth to cross-examine the witness because it had been legitimately surprised. The court reasoned that the witness never repudiated her original statement under oath and the Commonwealth could reasonably have expected the witness' testimony at trial to be consistent with that statement. The court relied upon its earlier decision in *Commonwealth v. Bowers*, 182 Pa.Super. 628, 127 A.2d 806 (1956), for the proposition that the Commonwealth was justified in believing that when the witness was sworn as a witness at trial, the

witness would respect the sanctity of her oath and that her testimony in all probability would be consistent with her prior statement.

*Commonwealth v. Barber,* 275 Pa.Super. 144, 418 A.2d 653 (1980), involved a similar case in which the Commonwealth pled surprise and was able to cross-examine its own witness when a witness testified inconsistently with a written statement given to police prior to trial. The defendant contended that the trial court erred because the Commonwealth was aware in advance of trial that the witness would be uncooperative. The district attorney admittedly knew that the witness was friendly with the defendant, did not want to testify and feared reprisal if he did testify. The Superior Court found that the testimony of the witness at trial was unexpected because the district attorney had no reason to believe that the witness would deviate from his statement to police, and that the district attorney's knowledge that the witness did not want to testify and feared reprisal was not to be equated with knowledge that the witness would change his testimony.

These cases were decided prior to this Court's decision in *Commonwealth v. Brady,* 510 Pa. 123, 507 A.2d 66 (1986), in which we departed from the longstanding rule that prior inconsistent statements of a witness could only be used to impeach the credibility of the witness, not as substantive evidence to prove the truth of the matters asserted therein. We held that such statements may be used as substantive evidence where the declarant is a witness at trial and available for cross-examination.[4]

The defendant in *Brady* was convicted of second degree murder, burglary and criminal mischief for the stabbing death of a security guard. During a police interview conducted on the day of the murder, the defendant's girlfriend admitted

---

4. *Brady* was further refined in *Commonwealth v. Lively,* 530 Pa. 464, 610 A.2d 7 (1992), in which we held that a prior inconsistent statement by a non-party witness shall be used as substantive evidence only when the statement was given under oath at a formal legal proceeding, or the statement was reduced to a writing signed and adopted by the declarant, or the statement was recorded verbatim contemporaneously with the making of the statement.

that she had witnessed the defendant killing the guard. The police obtained a tape-recorded statement from the girlfriend to that effect, which she recanted at trial when called as a witness by the Commonwealth.

The Commonwealth was aware prior to trial that the girlfriend intended to recant her statement because the girlfriend had filed an affidavit recanting the statement. A pre-trial application was filed by the Commonwealth requesting that the tape-recorded statement be ruled admissible at trial. The trial court granted the application. Defense counsel, who had opposed the application, renewed his objections at trial. The statement was later admitted as substantive evidence.

On appeal to Superior Court, the defendant argued that the trial court erred in allowing the Commonwealth to impeach its own witness and in permitting the tape-recorded statement to be introduced as substantive evidence. The Superior Court reversed the judgments of sentence and remanded for a new trial, finding that the trial court erred in allowing the Commonwealth to impeach the witness because the witness had recanted her tape-recorded statement prior to trial. The court concluded that the version of the events testified to by the witness at trial was not unexpected and that it was improper to plead surprise. The court further concluded that the evidence was inadmissible as substantive evidence.

We reversed, holding that a prior inconsistent statement of a declarant who is a witness in a judicial proceeding and is available for cross-examination may be used as substantive evidence to prove the truth of the matters asserted therein. We also rejected the Superior Court's conclusion that the trial court erred when it permitted the Commonwealth to impeach its own witness with the prior inconsistent statement. We quoted, with approval, the following portion of the trial court's opinion which discussed the issue:

We conclude that it was well within the Court's discretion to permit the cross-examination of [the witness]. The foregoing cases emphasize that the parties must be afforded the opportunity to present the truth unhindered by technicali-

ties. This is also a primary consideration in permitting the jury to use a prior statement as substantive evidence. It would be a technicality indeed to permit the use of the statement as substantive evidence but not allow the cross-examination of one's own turncoat witness, regardless of surprise. We note further that the weight of scholarly authority is in accord with this result. See 3A Wigmore, Evidence § 902 et seq. (Chadbourn rev.1970).

507 A.2d at 71–72 (citation omitted).

We found that the Superior Court had erred in elevating one factor in the determination of when a party should be permitted to impeach its own witness—the factor of surprise—to an indispensable element. We observed that the general rule against the impeachment of one's own witness had been considerably relaxed to prevent injustice and the tendency of the courts is to permit parties to show the truth without strict regard to technicalities. *Id.* at 72 (citation omitted). [T]he element of surprise is not an absolute requirement in the exercise of the court's discretion to allow a party to impeach his or her own witness.... *Id.*

The evolution of surprise from a requirement to be satisfied before impeachment of one's own witness to a technicality reflects the difficulty in carrying on a traditional rule whose efficacy had diminished. The overriding principles of truth and justice have effectively dispensed with the element of surprise. Applying the foregoing analysis to the case before us, we conclude that the trial court abused its discretion in denying defense counsel the opportunity to cross-examine Mary Herko regarding her prior statement about the telephone conversation with victim Bonnie Dryfuse.

In this case, the trial court determined that there was no genuine surprise to Kimbell when Mary Herko did not testify in accordance with her prior statement to the State Police. The court also found that the testimony was not truly contradictory, and that her testimony neither harmed Kimbell nor benefited the Commonwealth. We disagree.

There is a significant difference between Mary Herko's testimony that Bonnie Dryfuse did not identify the individual who pulled up in her driveway shortly before she was murdered and Herko's earlier statement that Bonnie Dryfuse had identified her husband as the individual who had arrived at that time. The inconsistency lies in the fact that the testimony failed to indicate that Bonnie Dryfuse's conversation indicated that she knew the identity of the individual who had entered the driveway. Mary Herko's testimony at trial would lead the jury to believe that Bonnie Dryfuse had not identified her husband as that person. Furthermore, defense counsel's inability to cross-examine Herko regarding the statement deprived Kimbell of an opportunity to establish that Tom Dryfuse was at the scene of the murders during the time that he had claimed to be elsewhere, as well as an opportunity to offer an explanation for the presence of the blood of Tom Dryfuse's daughter, whose body he had denied touching, on Dryfuse's hand. This obviously worked to the benefit of the Commonwealth. We will not deprive Kimbell of his opportunity to present a defense when to do so would revive a concept of surprise that has been consistently rejected by our courts.

Accordingly, the judgments of sentence are vacated and the matter is remanded for a new trial.