J-S16037-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                                  :  PENNSYLVANIA
                                                  :
               v.                              :
                                                  :
                                                  :
BRAHEIM PARKER,                      :
                                                    :
              Appellant            :  No. 1104 EDA 2019

Appeal from the PCRA Order Entered March 8, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008056-2009

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:             **FILED JULY 12, 2021**

Appellant, Braheim Parker, appeals from the March 8, 2019, order entered in the Court of Common Pleas of Philadelphia County, which dismissed Appellant's first petition filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546, without an evidentiary hearing. After a careful review, we affirm.

This Court has previously set forth the relevant facts and procedural history, in part, as follows:

> On August 5, 2008, shortly after midnight, Dorothy Miller [("Grandmother")] observed her grandson, Chauncy Miller [("Victim")], go out onto the porch of her house, located on 29th Street between Jefferson Street and Master Street in the City of Philadelphia. Approximately one hour later, [Victim] called [G]randmother and, with a frustrated voice,

---

[*] Former Justice specially assigned to the Superior Court.

asked her to "tell Bey[1] that he had been in the house all day" and to tell Bey that "he didn't take anything from anybody and doesn't have anything." [Grandmother] instructed [Victim] to put Bey on the phone, but moments later the phone went dead. Approximately[ ] ten minutes later, [G]randmother received another call in which the caller said "Grandmom, Chauncy just been shot on 28th Street outside right where the church is." [Grandmother] immediately went to the location on 28th Street, but [she] could not see [Victim] because the police had already placed a sheet over his body and were securing the crime scene.

Anthony Hyman [("Hyman")] had been sitting out on the porch of a friend's house located near 1400 North 28th Street when he heard a gunshot. He looked toward Jefferson Street and observed a male weaving in and out of parked cars being chased by another male who continued shooting at him. Hyman ran into the lot on the corner and laid in the grass. He heard another shot and then saw the male being shot at run past the lot. After the gunshots had stopped, Hyman exited the lot and saw a male named Dante Jones [("Jones")] and a female walking from Master Street onto 28th Street. Hyman then saw the body of the man who was shot lying in the street. Hyman told Jones that he had not seen the shooter, even though he had, because he did not want his knowledge of the shooting being spread to the [community]. Jones told Hyman that the male who had been shot was named Chauncy.

Officer [Lynda] Smith was the first officer to respond to the radio call for a shooting in the vicinity of 28th Street and Master Street and, upon arrival, [she] observed [Victim] lying on the ground with Hyman and Jones standing next to him. [Victim] was not conscious, was bleeding from the head, and was pronounced dead at 1:40 a.m. by [a paramedic].

---

[1] Victim's mother testified that she recognized Appellant, and she knew him as "Little Beyot or Beyot." N.T., 3/1/11, at 61.

Trial Court Opinion, 2/24/14, at 4–5 (internal alterations, footnotes, and honorifics omitted).

On September 23, 2008, a criminal complaint was filed charging Appellant with first-degree murder, possession of a firearm by a prohibited person, carrying a firearm without a license, carrying a firearm on the streets of Philadelphia, and possession of an instrument of crime.[2]  On June 19, 2009, a criminal information was filed charging those same offenses.  On February 28, 2011, a jury was seated and trial began on March 1, 2011.  On March 4, 2011, Appellant[, who was represented by counsel], was found guilty of all charges and immediately sentenced to an aggregate term of life imprisonment without the possibility of parole.

Appellant filed a timely notice of appeal.

*Commonwealth v. Parker*, 104 A.3d 17, 19-20 (Pa.Super. 2014) (footnotes omitted) (footnotes added).

On appeal, Appellant contended the trial court erred in denying his motion *in limine* to exclude hearsay testimony of a conversation between Victim and Grandmother; the trial court erred in providing the jury with the statement and photo array, which had been presented to the main Commonwealth witness; the trial court erred in denying Appellant's motion for a mistrial when a police detective testified a photo array was generated from a police database; the trial court erred in denying Appellant's motion to prevent a detective from testifying about "double hearsay" concerning the Commonwealth witness's motivation to testify less than truthfully; and the

---

[2] 18 Pa.C.S.A. §§ 2502(a), 6105(a)(2)(i), 6106(a)(1), 6108, and 907(a), respectively.

- 3 -

trial court erred in charging the jury on flight when the record failed to establish evidence of flight. *Id.* at 21.

After a careful review, this Court found Appellant's claims to be waived and/or meritless, and thus, we affirmed his judgment of sentence. *See id.* Appellant filed a timely petition for allowance of appeal, which our Supreme Court denied on June 10, 2015.

On or about May 27, 2016, Appellant filed a timely, *pro se* PCRA petition, and the lower court appointed counsel to assist Appellant. On June 9, 2017, and September 19, 2017, counsel filed amended PCRA petitions, and on May 17, 2018, the Commonwealth filed a motion to dismiss Appellant's PCRA petition.

On January 15, 2019, the PCRA court provided Appellant with notice of its intent to dismiss the PCRA petition without an evidentiary hearing. Appellant did not file a response, and on March 8, 2019, the PCRA court dismissed the petition. On April 1, 2019, Appellant filed a timely, counseled notice of appeal. All Pa.R.A.P. 1925(b) requirements have been sufficiently met.

On appeal, Appellant sets forth the following issues in his "Statement of Questions Involved" (verbatim):

> I. Were Appellant's constitutional rights under the Sixth and Fourteenth Amendments of the U.S. Constitution and Article 1 sec. 9 of the Pennsylvania Constitution violated by trial counsel's failure to interview and call critical eyewitnesses to testify for the defense?

II. Were Appellant's constitutional rights under the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution and Article 1 sec. 9 of the Pennsylvania Constitution violated by trial counsel's failure to 1) interview Hyman and file a Motion to Suppress and 2) object to the prosecutor's impeachment of its own witness with his statement to police and his preliminary hearing testimony?

III. Were Appellant's constitutional rights under the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution and Article 1 sec. 9 of the Pennsylvania Constitution violated by trial counsel's failure to timely object to double hearsay testimony from Det. Cahill that Anthony Hyman said that his brother received phone calls about Hyman coming to court?

IV. Were Appellant's constitutional rights under the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution and Article 1 sec. 9 of the Pennsylvania Constitution violated by trial counsel's failure to timely object to the reasonable doubt instruction and, if necessary, preserve the claim for review on direct appeal?

V. Were Appellant's constitutional rights under the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution and Article 1 sec. 9 of the Pennsylvania Constitution violated by trial counsel's failure to properly object to the instruction on 'flight'?

VI. Did the cumulative impact of multiple instances of ineffective assistance of counsel deprived [*sic*] Appellant of his due process rights under the 14th Amendment?

Appellant's Brief at 3-4 (suggested answers omitted).

Initially, as a general proposition, we note "[o]ur standard of review of the denial of PCRA relief is clear; we are limited to determining whether the PCRA court's findings are supported by the record and without legal error." ***Commonwealth v. Wojtaszek***, 951 A.2d 1169, 1170 (Pa.Super. 2008) (quotation marks and quotation omitted).

Further, inasmuch as Appellant's claims present allegations of ineffective assistance of trial counsel, we apply the following well-established legal principles:

> In order to be eligible for PCRA relief, the petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found in Section 9543(a)(2), which includes the ineffective assistance of counsel. 42 Pa.C.S.[A.] § 9543(a)(2)(i).
>
> It is well-established that counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him. To prevail on an ineffectiveness claim, the petitioner has the burden to prove that (1) the underlying substantive claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance. The failure to satisfy any one of the prongs will cause the entire claim to fail.

*Commonwealth v. Benner*, 147 A.3d 915, 919–20 (Pa.Super. 2016) (quotation marks, quotations, and citations omitted).

> We need not analyze the prongs of an ineffectiveness claim in any particular order. Rather, we may discuss first any prong that an appellant cannot satisfy under the prevailing law and the applicable facts and circumstances of the case. [C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.

*Commonwealth v. Johnson*, 635 Pa. 665, 139 A.3d 1257, 1272 (2016) (citations omitted). *See Commonwealth v. Daniels*, 600 Pa. 1, 963 A.2d 409, 419 (2009) ("A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.") (citation omitted)). "A claim has arguable merit where the factual averments, if accurate, could

establish cause for relief." ***Commonwealth v. Stewart***, 84 A.3d 701, 707

(Pa.Super. 2013) (*en banc*) (citation omitted).

>    Further,

> To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. [A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.

***Commonwealth v. Spotz***, 624 Pa. 4, 84 A.3d 294, 311-12 (2014) (citations,

quotation marks, and quotations omitted).

In his first issue, Appellant contends trial counsel was ineffective in

failing to interview and call two alleged eyewitnesses, Renaldo Robichaw and

Terell McClennan, to testify at trial for the defense. Appellant avers "prior to

trial Appellant told his attorney that [Mr.] Robichaw and [Mr.] McClennan were

both present and eyewitnesses to the shooting[.]" Appellant's Brief at 11

(citing to reproduced record at 8).[3] Thus, Appellant contends trial counsel

was ineffective in failing to interview the two eyewitnesses. ***Id.***

---

[3] We note that reproduced record page 8 is a copy of Appellant's affidavit, which he attached to his amended PCRA petition and included in the certified record. In the affidavit, Appellant averred he informed his trial counsel that there were approximately thirty people in the area when the shooting occurred, and he recognized many of the people. Notably, Appellant did not name or otherwise identify any of these alleged thirty people. Particularly, in his affidavit, Appellant did not aver that he informed trial counsel of the existence of Mr. Robichaw or Mr. McClennan as potential eyewitnesses.

- 7 -

Further, Appellant asserts that, if called to testify, Mr. Robichaw and Mr. McClennan "would have provided a viable alternative suspect: [Kwami] Walker." Appellant's Brief at 19 (footnote omitted). Thus, Appellant contends trial counsel was ineffective in failing to call the two eyewitnesses to testify at trial.

With regard to the failure to interview potential witnesses, our Pennsylvania Supreme Court has held as follows:

> Counsel has a general duty to undertake reasonable investigations or make reasonable decisions that render particular investigations unnecessary....The duty to investigate...may include a duty to interview certain potential witnesses; and a prejudicial failure to fulfill this duty, unless pursuant to a reasonable strategic decision, may lead to a finding of ineffective assistance....
>
> [W]here there is a limited amount of evidence of guilt, it is *per se* unreasonable not to attempt to investigate and interview known eyewitnesses in connection with defenses that hinge on the credibility of other witnesses....
>
> [S]uch a *per se* failing as to performance, of course, does not make out a case of prejudice....

*Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 535–36 (2009) (citations omitted). "To demonstrate prejudice where the allegation is the failure to interview a witness, the petitioner must show that there is a reasonable probability that the testimony the witness would have provided would have led to a different outcome at trial." *Commonwealth v. Pander*, 100 A.3d 626, 642 (Pa.Super. 2014) (*en banc*) (citation omitted).

Moreover, trial counsel's failure to call a particular witness to testify does not constitute ineffectiveness *per se*. **Commonwealth v. Cox**, 603 Pa. 223, 983 A.2d 666, 693 (2009) (citation omitted).

> When raising a claim of ineffectiveness for the failure to call a potential witness, a petitioner satisfies the performance and prejudice requirements…by establishing that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

**Commonwealth v. Sneed**, 616 Pa. 1, 45 A.3d 1096, 1108-09 (2012) (citations omitted).

Further, it is well-settled that a claim counsel was ineffective for failing to interview or call witnesses to testify lacks arguable merit where the trial court conducted a colloquy of the defendant at trial, and the defendant agreed with counsel's decision not to interview or present witnesses. **See Pander**, **supra**. "[A] defendant who makes a knowing, voluntary, and intelligent decision concerning trial strategy will not later be heard to complain that trial counsel was ineffective on the basis of that decision." **Commonwealth v. Paddy**, 569 Pa. 47, 800 A.2d 294, 316 (2002) (citation omitted). Accordingly, "[a] defendant who voluntarily waives the right to call witnesses during a colloquy cannot later claim ineffective assistance and purport that he was coerced by counsel." **Commonwealth v. Lawson**, 762 A.2d 753, 756 (Pa.Super. 2000).

After a careful review, we agree with the PCRA court that Appellant is not entitled to relief on his claim that trial counsel was ineffective in failing to interview and/or call Mr. Robichaw or Mr. McClennan to testify. *See Pander*, *supra*.

In the case *sub judice*, at the close of the Commonwealth's case-in-chief at trial, an exchange between the trial court and defense counsel, as well as an oral colloquy of Appellant, occurred regarding the possibility of defense witnesses and evidence. Specifically, the following relevant exchange occurred:

**THE COURT:** [The Assistant District Attorney] is going to rest. [Defense counsel], how do you wish to proceed?

**[DEFENSE COUNSEL]:** Judge, there were two—we, obviously, were waiting to see if Mr. Atwell was located, and if he was located, there would have been a decision to be made.

The two potential witnesses that could have been called on his behalf, is sister, Deshanda Parker—Deshanda Parker, who potentially was there and observed certain things. I have not really discussed it in detail. I have discussed briefly with her— and, to be honest with you, I have discussed it with [Appellant]— if Mr. Atwell was here, I would not have called [him] for various tactical reasons.

**THE COURT:** Now that he is not here, what do you want to do, because it's time?

**[DEFENSE COUNSEL]:** My advice to [Appellant] would be to certainly not call [Ms. Parker].

The second potential witness would be a guy by the name of Andre Williams. I was provided the information on Friday. I presented the information to the Assistant District Attorney on Friday. I spoke to the man once on the phone. He indicated he would be available. He is not available, because I tried to contact him by phone in recent days and he has not picked the phone up. I believe at 11 o'clock last night he answered the phone and told me he was someone else.

- 10 -

In any event, I don't believe I would have called him either. I believe even if Mr. Atwell was located, we would have let it go in as is.

I discussed this with [Appellant] on previous occasions in the last couple of days, if we were going to put anything on. I believe [Appellant] and myself agreed, probably on Monday, and he can be asked, that, chances are, we were not going to put any evidence on. We were going to let the Commonwealth present its case with whatever evidence they had it would go to the jury.

**THE COURT:** With what, what is the second citizen's name?

**[DEFENSE COUNSEL]:** Andre Williams. I have an address and phone number that I don't want to make part of the record.

**THE COURT:** I'm not asking you to. I'm just asking the name.

**[DEFENSE COUNSEL]:** She's been available in the building. She was interviewed or talked to by Homicide yesterday, as a matter of fact, Ms. Deshanda Parker.

**THE COURT:** This other young man, Andre Williams, even though you believe you spoke to him last night, the person who answered the phone didn't claim to be Mr. Williams?

**[DEFENSE COUNSEL]:** The person who answered the phone, who appeared to me to be the same voice that I talked to the last time I talked to him, indicated that Andre Williams was not there but he would give him a message. I told him it was imperative that Andre Williams be here at 9:30; might have said ten o'clock. In any event, Mr. Williams is not here. I have been unsuccessful in my attempts to locate him. In any event---

**THE COURT:** But bottom line, what you're telling me is, even if he were available, it would be your advice to [Appellant] that you believe in a strategic interest not to have Mr. Williams take the stand?

**[DEFENSE COUNSEL]:** That is absolutely correct. I believe if he took the stand, the main question from the District Attorney, which I think would be a pretty persuasive argument, was, "Where were you for the last three years?" And having had the trial go on and my one discussion with him, my advice would be not to use him, in any event.

The third thing would be, we have discussed whether or not he would testify and, as I indicated to you, I believe it's his desire not to testify.

**THE COURT:** Let me talk to [Appellant].

At this time you actually have no exhibits?

**[DEFENSE COUNSEL]:** Correct.

**THE COURT:** [Appellant], you have just heard my conversation with [defense counsel]. There are a couple of issues that you need to decide. That is, what has just occurred is [defense counsel] shared with me, not the details of your conversations, but the substance of his best advice to you. It is his advice to you that you not call your sister, Ms. Parker, and this other citizen is simply not available. But it would be [defense counsel's] advice to you that should this young man walk in the door, it would be his advice to you not to call this citizen, Andre Williams.

The calling of witnesses really is a strategic decision. It is always my position that clients should defer to the lawyers on strategic decisions. But ultimately whatever this jury decides, you're the one that has to live with the decision.

So while it is [defense counsel's] best advice to you that you not call Ms. Parker, and that you are not harmed by the fact that Mr. Williams has not shown up, are you comfortable with the fact that [defense counsel] is going to rest without the admission of any evidence?

**[APPELLANT]:** Yes.

**THE COURT:** Are there any other people that you wanted [defense counsel] to investigate and/or call to the stand?

**[APPELLANT]:** No.

**THE COURT:** Now, the other decision, and this, truly, is your decision and your decision alone, that's whether to take the stand….Having considered his advice, have you made a personal decision as to whether or not you wish to take the stand in this case?

**[APPELLANT]:** No, I don't want to take the stand.

**THE COURT:** Is there anything else that you would have [defense counsel] do?

**[APPELLANT]:** No.

**THE COURT:** Are you satisfied with [defense counsel's] representation of you?

**[APPELLANT]:** Yes.

- 12 -

**[THE COURT]:**…I see here you're saying that you're satisfied with the work [defense counsel] has done on your behalf; is that correct?

**[APPELLANT]:** Yes.

**THE COURT:** Do you have any other questions? Because what is going to happen is that I am going to step away. They're going to put the jury in the box and [the Assistant District Attorney] is going to stand up and formally close. She will say "I rest" with the admission of her exhibits, and then I am going to turn to [defense counsel] and say "How do you wish to proceed?" He's going to say "I rest," and then I'm going to ask them to make their closing statements.

**[APPELLANT]:** Yes.

**THE COURT:** Are you comfortable?

**[APPELLANT]:** Yes.

**THE COURT:** Very good.

N.T., 3/3/11, at 2-9.

In rejecting Appellant's claim that trial counsel was ineffective in failing to interview or call two alleged eyewitnesses, Renaldo Robichaw and Terell McClennan, the PCRA court relevantly indicated the following:

> In the matter *sub judice*, the trial judge did in fact colloquy the [A]ppellant. First[,] the trial judge inquired as to his trial counsel's decision not to call Deshanda Parker and Andre Williams to which [A]ppellant responded that he agreed with counsel's strategic decision not to call these witnesses. The [trial] [c]ourt then asked [A]ppellant if there were "any other people that you wanted [defense counsel] to investigate and/or call to the stand" to which the [A]ppellant answered "No." N.T., 3/3/11, [at] 2-6. The [trial] [c]ourt also asked [A]ppellant if there was "anything else that you would like [defense counsel] to do" to which [A]ppellant responded "No." *Id.* [at] 8.
>
> Therefore, [A]ppellant cannot now come forward years later and contradict his own sworn statements to the [trial] [c]ourt and prevail in light of the [trial] [c]ourt's specific and detailed colloquy.

- 13 -

PCRA Court Opinion, filed 12/7/20, at 6 (citation omitted).

We agree with the PCRA court's sound reasoning. Based on Appellant's representations at trial, to which he is bound, Appellant may not now assert that trial counsel was ineffective for failing to interview or present the testimony of alleged additional witnesses: Mr. Robichaw and Mr. McClennan. *See Pander*, *supra*. From the aforementioned colloquy, it is clear that Appellant was advised of his right to present a defense, ask defense counsel to investigate additional witnesses, and call witnesses at trial. However, Appellant knowingly and voluntarily declined to do so.

Simply put, Appellant chose not to have trial counsel investigate additional witnesses or call the witnesses that he now faults trial counsel for failing to present at trial. *See Paddy*, *supra*. Appellant may not now assert that trial counsel was ineffective for failing to interview or present additional witnesses where Appellant informed the trial court that there were no "other people that [he] wanted [defense counsel] to investigate and/or call to the stand." N.T., 3/3/11, at 7. Thus, Appellant is not entitled to relief on his ineffective assistance of counsel claim. *See Paddy*, *supra*; *Pander*, *supra*; *Lawson*, *supra*.

In his next issue, Appellant contends trial counsel was ineffective in failing to interview a Commonwealth witness, Anthony Hyman, prior to trial. Appellant contends that, had trial counsel interviewed Mr. Hyman, he would have discovered that Mr. Hyman's pre-trial identification of Appellant was

unduly influenced and/or coerced by the police so as to support a motion to suppress Mr. Hyman's pre-trial identification of Appellant as the shooter. Appellant also avers trial counsel was ineffective in failing to object to the Commonwealth's impeachment of its own witness, Mr. Hyman, at trial.

For background purposes, the record reveals Mr. Hyman, who was fifteen years old, was an eyewitness to the shooting. After the shooting, he waited for the police to arrive on the scene, and he informed them he had witnessed the shooting. N.T., 3/1/11, at 89-91. Mr. Hyman went with the police to the station, and at approximately 3:45 a.m., the police began formally interviewing Mr. Hyman. *Id.* at 125. The interview lasted until 6:32 a.m. *Id.* at 126.

During the police interview, Mr. Hyman positively identified Appellant as the shooter from a photo array, as well as provided a detailed account of what he had witnessed. *Id.* at 95. In his statement, *inter alia*, Mr. Hyman confirmed he saw the shooter's face, and no one had "threatened or forced him in any way to give th[e] statement or make th[e] identification." *Id.* at 99, 102, 116. Moreover, Mr. Hyman placed his initials after every answer in the written police statement in order to confirm the truthfulness of his answers. *Id.* at 116-17. Additionally, the police statement included a "Statement Adoption Attestation" wherein Mr. Hyman acknowledged that his statement had been written down verbatim by a detective, and his statements were true and correct. *Id.* at 118.

Despite Mr. Hyman identifying Appellant as the shooter during his police statement on the night of the shooting, Mr. Hyman testified at Appellant's preliminary hearing, at which Appellant was present, that the person he saw shooting at Victim was not in the courtroom. *Id.* at 136.

Moreover, during Appellant's trial, when the Assistant District Attorney ("ADA") asked Mr. Hyman whether he saw "anyone in the courtroom today that [he] recognize[d] from [the] day [of the shooting]," Mr. Hyman responded "No." *Id.* at 90. The ADA then questioned Mr. Hyman utilizing his police statement.

Specifically, the relevant exchange occurred during the direct examination of Mr. Hyman at trial:

> **[ADA]:** Flip to page three [of your police statement].
>
> QUESTION: This is Detective Morton and he is going to show you eight photographs marked Photo Spread 1 and numbered one to eight which we want you to look at and tell us if you recognize anyone depicted in these photos.
>
> And your answer was: Yes, number four.
>
> Can you flip to that?
>
> Do you see number four?
>
> **[MR. HYMAN]:** Yes.
>
> **[ADA]:** And the answer to the question that I just read, I read it correctly, right?
>
> **[MR. HYMAN]:** You read it correctly, but when I was in there, they was—I was looking at the pictures and they was like, oh, is that the picture, and I was just looking at it. They was like if it was him, circle the picture. It was like circle the picture. It was like making me circle the picture.
>
> **[ADA]:** You initialed it?
>
> **[MR. HYMAN]:** Yeah. I initialed it.

**[ADA]:** QUESTION: Where do you recognize the male depicted in Photo No. 4 from?

ANSWER: He is the guy that was chasing [Victim] down the street and shooting at him.

And in parentheses it indicates that you identified [Appellant], correct?

**[MR. HYMAN]:** That's correct with the picture, but like I said before, they was like forcing me to pick the picture just because I looked at that one time. As soon as I went down the line, they made me stop at number four, oh, that's him, circle the picture, circle the picture.

**[ADA]:** I read that correctly?

**[MR. HYMAN]:** I just said you read it correctly, but.

**[ADA]:** You initialed it?

**[MR. HYMAN]:** Yeah. But from what I'm saying that they basically made me circle the picture.

*Id.* at 112-13.

Based on the aforementioned, Appellant initially avers trial counsel was ineffective in failing to interview Mr. Hyman prior to trial. In this vein, Appellant contends that, had trial counsel interviewed Mr. Hyman prior to trial, trial counsel would have discovered what Mr. Hyman told the jury, *i.e.*, that the police "repeatedly and suggestively singled out" Appellant, which is the sole reason Mr. Hyman identified Appellant from the photo array. Appellant's Brief at 2. Further, he contends that, armed with this information, trial counsel should have filed a motion to suppress Mr. Hyman's pre-trial identification of Appellant.

With regard to trial counsel's failure to interview Mr. Hyman prior to trial, as indicated *supra*, during an on-the-record colloquy, Appellant informed

- 17 -

the trial court he did not want trial counsel to interview any person who had not already been interviewed. N.T., 3/3/11, at 7. ***See Paddy***, ***supra***; ***Pander***, ***supra***. In any event, assuming, *arguendo*, trial counsel's performance was deficient in failing to interview Mr. Hyman prior to trial, we conclude Appellant has failed to plead and prove the necessary prejudice. ***See Johnson***, ***supra***.

To show prejudice, Appellant must demonstrate how trial counsel's interviewing of Mr. Hyman would have been beneficial under the circumstances of the case. ***See id.*** On appeal, Appellant posits that, had trial counsel interviewed Mr. Hyman, Mr. Hyman would have informed trial counsel that the police pressured him to choose Appellant's photo from the array. However, aside from Appellant's speculation, Appellant has made no offer of proof that Mr. Hyman would have been willing to recant his police statement to trial counsel prior to trial.

In this regard, it is noteworthy that, although Appellant attached a signed certification of proposed witnesses to his amended PCRA petition, Mr. Hyman was not included as a proposed witness.[4] ***See Pander***, 100 A.3d at 640 ("Where a petitioner requests an evidentiary hearing, the petition shall include a signed certification as to each intended witness stating the witness's name, address, date of birth and substance of testimony and shall include any

---

[4] Appellant included the following people as potential witnesses in his certification: Appellant, trial counsel, Mr. Robichaw, and Mr. McClennan.

documents material to that witness's testimony. Failure to substantially comply with the requirements of this paragraph shall render the proposed witness's testimony inadmissible.") (quoting 42 Pa.C.S.A. § 9545(d)(1)). Moreover, Appellant made no assertion that any other witness would be able to shed light on this issue. Thus, Appellant is not entitled to relief on his claim that trial counsel was ineffective in failing to interview Mr. Hyman prior to trial or file a suppression motion based on statements Mr. Hyman might have made during the interview. **See Pander**, **supra** (holding the PCRA petitioner must establish there is a reasonable probability that the outcome of his trial would have been different had trial counsel interviewed a witness prior to trial).

As indicated *supra*, Appellant further asserts trial counsel was ineffective in failing to object to the Commonwealth's impeachment of its own witness, Mr. Hyman, at trial. Specifically, Appellant contends the Commonwealth was not permitted to impeach Mr. Hyman with his prior inconsistent police statement unless the Commonwealth could demonstrate it was "surprised" by Mr. Hyman's trial identification testimony or there was evidence Mr. Hyman was a "hostile witness." Appellant's Brief at 28. Appellant suggests the Commonwealth failed in both regards.

We conclude there is no arguable merit to Appellant's claim, and therefore, trial counsel cannot be ineffective on this basis. **See Johnson**, **supra**, 139 A.3d at 1272 ("[C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.") (citation omitted)).

Pennsylvania Rule of Evidence 607 relevantly provides:

**Rule 607. Who May Impeach a Witness, Evidence to Impeach a Witness**

**(a)  Who May Impeach a Witness.** Any party, including the party that called the witness, may attack the witness's credibility.

Pa.R.E. 607(a) (bold in original).  This Court has held that it is within the trial court's discretion to permit a party to impeach its own witness. ***Commonwealth v. Grimes***, 648 A.2d 538 (Pa.Super. 1994).

As is evident, Pa.R.E. 607(a) does not provide that the Commonwealth must be "surprised" by or encounter a "hostile witness" as a prerequisite to impeaching its own witness.[5]  Here, the trial court was within its discretion to permit the Commonwealth to impeach Mr. Hyman's trial testimony with his prior inconsistent statement, which was written verbatim, adopted, and signed by Mr. Hyman within hours after the shooting.[6]  ***See Grimes***, ***supra***. ***See***

---

[5] In support of his contention that the Commonwealth was required to demonstrate surprise or hostility prior to impeaching its own witness, Appellant relies on ***Commonwealth v. Thomas***, 459 Pa. 371, 329 A.2d 277 (1974).  However, as our Supreme Court later recognized in ***Commonwealth v. Kimball***, 563 Pa. 256, 759 A.2d 1273 (2000), ***Thomas*** was decided under common law principles and not under Pa.R.E. 607, which our Supreme Court adopted on May 8, 1998.  Pa.R.E. 607 is applicable to the instant matter.

[6] This Court has held:

> Our courts long have permitted non-party witnesses to be cross-examined on prior statements they have made when those statements contradict their in-court testimony.
> Such statements, known as prior inconsistent statements, are admissible for impeachment purposes. Pa.R.E. 613(a).

*(Footnote Continued Next Page)*

*also Commonwealth v. Rouse*, 782 A.2d 1041 (Pa.Super. 2001) (holding relevant impeachment evidence admissible where probative value outweighs danger of unfair prejudice). Thus, there is no arguable merit to Appellant's claim, and trial counsel may not be deemed ineffective on this basis.

In his next issue, Appellant contends trial counsel was ineffective in failing to object to "double hearsay" testimony regarding Mr. Hyman's motivation for recanting his pre-trial identification of Appellant as the shooter. Specifically, Appellant contends trial counsel was ineffective in failing to object to the following relevant exchange between the ADA and Detective John Cahill during his direct examination:

_____

> Further, a prior inconsistent statement may be offered not only to impeach a witness, but also as substantive evidence if it meets additional requirements of reliability. Pa.R.E. 803.1. The test is a two-part inquiry: 1) whether the statement is given under reliable circumstances; and 2) whether the declarant is available for cross-examination. With respect to the first prong, that the statement is given under reliable circumstances, our supreme court has deemed reliable only certain statements; among them is a statement that is "reduced to a writing and signed and adopted by the witness." With respect to the second prong, cross-examination, the inconsistent statement itself must be the subject of the cross-examination in order to satisfy the test.

*Commonwealth v. Carmody*, 799 A.2d 143, 148 (Pa.Super. 2002) (citations and quotations omitted).

Here, Appellant does not dispute that Mr. Hyman's statement to the police constitutes a prior inconsistent statement; but rather, he contends that, absent a showing of "surprise" or "hostility," the Commonwealth was not permitted to use the statement to impeach Mr. Hyman since he was the Commonwealth's own witness. As indicated *supra*, we find no merit to this contention. *See* Pa.R.E. 607(a).

**[ADA]:** You indicated that, in fact, his brother lived in the area. Were you here yesterday waiting to testify?

**[DETECTIVE CAHILL]:** Yes, I was.

**[ADA]:** Did you have occasion to speak with Mr. Hyman?

**[DETECTIVE CAHILL]:** Yes, I did.

**[ADA]:** Did Mr. Hyman have occasion to indicate to you whether or not his brother was receiving phone calls about whether he was coming to court?

**[DETECTIVE CAHILL]:** Yes, he did.

**[ADA]:** Did he indicate that his brother, in fact, was?

**[DETECTIVE CAHILL]:** Yes, he did.

N.T., 3/2/11, at 25.[7]

Appellant contends Detective Cahill's testimony contains multiple levels of inadmissible hearsay. Specifically, Appellant contends the detective's testimony reveals Mr. Hyman's brother told Mr. Hyman, who in turn told the detective, about a telephone call wherein some unidentified person asked the brother whether Mr. Hyman was going to court. Appellant contends the testimony was offered for the truth of the matter asserted; that, is, to show that someone called Mr. Hyman's brother in an effort to intimidate Mr. Hyman,

---

[7] Appellant contended on direct appeal that the trial court erred in permitting Detective Cahill to offer the above testimony since it constituted "double hearsay." ***See Parker***, ***supra***. This Court found the issue to be waived. Specifically, we concluded that, although trial counsel objected to the admission of this testimony, which pertained to a conversation Detective Cahill had with Mr. Hyman in the courthouse hall on March 1, 2011, trial counsel's objection was limited to relevancy. ***Id.*** Accordingly, since trial counsel failed to object to the testimony based on hearsay, we found the issue to be waived. ***Id.***

who then testified at trial inconsistently with his prior police statement as to the identity of the shooter. **See** Appellant's Brief at 33.

Assuming, *arguendo*, trial counsel's performance was deficient in failing to lodge a hearsay objection to Detective Cahill's testimony, we conclude Appellant has failed to demonstrate the necessary prejudice. **See Spotz**, **supra** (holding that to demonstrate prejudice a petitioner must show there is a reasonable probability that the result of the proceedings would have been different but for counsel's unprofessional error).

During trial, Detective Cahill was not the only witness to offer testimony about an alleged phone call, which Mr. Hyman's brother received questioning whether Mr. Hyman was going to court. Rather, after Mr. Hyman testified on cross-examination that no one had threatened him before he came into court to recant his pre-trial identification of Appellant as the shooter, N.T. 3/1/11, at 140, Mr. Hyman testified as follows on redirect examination by the ADA:

> **[ADA]**: I want to ask you a couple more questions. Because you said to [defense counsel] that you were not threatened, I want to ask you, I don't want to know names or specific addresses, your brother, does he still live in that neighborhood?
>
> **[MR. HYMAN]:** Yes.
>
> **[ADA]:** And has your brother told you anything about phone calls he received this—
>
> > **[DEFENSE COUNSEL]:** Objection.
> >
> > **THE COURT:** Overruled.
>
> **[ADA]:** That means you can answer.
>
> **[MR. HYMAN]:** Can you ask the question again, please?
>
> **[ADA]:** Sure. Has your brother told you about phone calls he got?

**[MR. HYMAN]:** No, he called me and he just asked me was I still going to court and I told him—I said yes but I don't want to go. That's what I told my brother.

**[ADA]:** Your brother wasn't getting any phone calls?

**[MR. HYMAN]:** He got a phone call about—just about somebody asking him is—like is he still going to go to court. And I told my brother, yeah, I was going to court.

N.T., 3/1/11, at 150-51.

Inasmuch as the substance of Mr. Hyman's testimony regarding Mr. Hyman's brother's receipt of a phone call is substantially similar to Detective Cahill's testimony, we conclude Appellant has failed to demonstrate how the outcome of his trial would have been different had trial counsel properly objected to Detective Cahill's testimony based on hearsay. *See Spotz*, *supra*. Thus, Appellant is not entitled to relief on his claim that trial counsel was ineffective in failing to object to "double hearsay" testimony from Detective Cahill. *See id.*[8]

In his next issue, Appellant contends trial counsel was ineffective in failing to object to the trial court's reasonable doubt instruction. Specifically,

---

[8] To the extent Appellant suggests trial counsel was ineffective in failing to object to Mr. Hyman's testimony regarding his brother's receipt of phone calls, we note the record reveals trial counsel lodged an objection thereto. N.T., 3/1/11, at 150. Further, while Appellant arguably developed an analysis as to the "arguable merit prong" with regard to Mr. Hyman's testimony, he developed no argument on appeal as to the "prejudice prong" of the ineffectiveness test as to Mr. Hyman's testimony. *See Benner*, *supra* (setting forth requirements for ineffective assistance of counsel). Rather, his analysis concerning the prejudice prong relates only to Detective Cahill's testimony. *See* Appellant's Brief 31-36.

Appellant contends the trial court's use of a medical hypothetical impermissibly heightened the degree of reasonable doubt required to acquit.

We review "the jury charge as a whole to determine if it is fair and complete." *Commonwealth v. Jones*, 954 A.2d 1194, 1198 (Pa.Super. 2008) (citation omitted). "Error cannot be predicated on isolated excerpts of the charge…it is the general effect of the charge that controls." *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 314 (1999). Therefore, "an imperfect instruction does not constitute reversible error where the charge, taken as a whole, fairly and accurately conveys the essential meaning." *Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74, 92 (2004). "A trial court has wide discretion in phrasing its jury instructions, and can choose its own words as long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Jones*, 954 A.2d at 1198 (citation omitted). "Where an instruction is alleged to be ambiguous, the standard for review is whether there is a reasonable likelihood that the jury applied it in a manner that violates the Constitution." *Commonwealth v. Markman*, 591 Pa. 249, 916 A.2d 586, 613 (2007) (citation omitted).

Additionally, Pennsylvania courts have upheld verdicts of guilt resulting from trials wherein the court used real-life examples to explain the concept of reasonable doubt. *Commonwealth v. Jones*, 858 A.2d 1198, 1201 (Pa.Super. 2004) (affirming judgment of sentence where trial court attempted to clarify reasonable doubt by providing an example that dealt with the

decision to cross the street at noon, when traffic was heavy, as opposed to midnight, when there would be little to no traffic).

At trial, in the case *sub judice*, the trial court relevantly charged the jury as follows:

> Now, momentarily, after I give you the general body of law, I am going to define the crimes for you. The Commonwealth's burden is to prove the elements of the crimes. The elements are what make up the definition of each and every crime. And that is their burden.
>
> It's helpful to think about reasonable doubt in this way: Each and every one of you has someone that you love, someone who is precious to you, a spouse, a significant other, a sibling, a grandchild. Each one of you loves somebody. That's a great, good fortune that I have because I get to talk with people. I know each one of you loves somebody. So think about this for a minute.
>
> What if you were told by your precious one that they had a life-threatening condition, and that the only protocol for that condition was surgery? Now, very likely you're going to say, we need to get a second opinion. You might even want to get a third opinion. You're probably going to research that illness, go on the Internet, go to the library. If you're like me, you're going to your Rolodex and calling everyone you know who has anything to do at all with medicine: What do you know, tell me about the disease, tell me about the doctor, is surgery my only option, what are my choices, what can we do?
>
> But at some moment the question will be called. If you go forward with the surgery, it's not because you moved beyond all doubt. There are no guarantees, ladies and gentlemen. If you go forward, it's because you have moved beyond all reasonable doubt.
>
> A reasonable doubt must be a real doubt. It may not be a doubt that is imagined or manufactured, a doubt that you create to avoid carrying out what is a significant responsibility.
>
> You may not find [Appellant] guilty based upon a mere suspicion of guilt. The Commonwealth's burden is to prove [Appellant] guilty beyond a reasonable doubt. If the Commonwealth has met that burden, then [Appellant] is no loner [*sic*] presumed to be innocent, and you must find him guilty. On

> the other hand, if the Commonwealth has not met its burden, then you must find him not guilty.
>
> So how do you do this? You literally must consider and weigh the testimony of each witness and give it such weight as in your judgment it is fairly entitled to receive.

N.T., 3/3/11, at 93-95.

Appellant avers the trial court's hypothetical regarding pursuing a live-saving surgery for a loved one impermissibly heightened the degree of reasonable doubt required to acquit, and the instruction directed the jury to favor conviction. In support of his argument, Appellant cites to an unreported federal district court decision, in which a federal court found unconstitutional a nearly identical jury instruction. Appellant's Brief at 38 (*citing* **Brooks v. Gilmore**, 2017 WL 3475475 (E.D. Pa. 2017) (unpublished memorandum)).

In the case *sub judice*, the PCRA court concluded the reasonable doubt instruction, in the context of the jury charge as a whole, did not reduce the burden of proof. PCRA Court Opinion, filed 12/7/20, at 14. Further, the PCRA court determined trial counsel could not be ineffective for failing to object to a jury instruction that had been upheld by this Court, albeit in unpublished memorandum decisions. **Id.** at 12 (*citing* **Commonwealth v. Corbin**, 2016 WL 1603471 (Pa.Super. 2016) (unpublished memorandum) (rejecting the challenge to the identical illustrative hypothetical on reasonable doubt issued by the same trial judge herein); **Commonwealth v. Gant**, No. 1612 EDA 2007 (Pa.Super. 2009) (unpublished memorandum) (same); and

*Commonwealth v. Johnson*, No. 1639 EDA 1999 (Pa.Super. 2000) (unpublished memorandum) (same)).

Preliminarily, insofar as Appellant relies on *Brooks*, which found an identical instruction unconstitutional, we note we are "not bound by the decisions of federal courts inferior to the U.S. Supreme Court." *In re Stevenson*, 615 Pa. 50, 40 A.3d 1212, 1216 (2012). Even if we were to find *Brooks* persuasive, Appellant's trial occurred in 2011, and the *Brooks* decision was not issued until 2017. In Pennsylvania, it is well-established "that counsel cannot be deemed ineffective for failing to predict changes in the law." *Commonwealth v. Cousar*, 638 Pa. 171, 154 A.3d 287, 303 (2017) (citations omitted). As such, one cannot deem Appellant's trial counsel ineffective for failing to predict that a federal district court would interpret the law concerning a jury instruction to Appellant's benefit six years after his trial.

At the time of Appellant's trial, there was no binding precedent for trial counsel to follow. Additionally, while the trial court's specific example has not been reviewed in a published opinion of this Court, this Court has interpreted similar instructions differently from *Brooks* at least four times since Appellant's trial. *See Commonwealth v. Drummond*, 2021 WL 603244 (Pa.Super. filed 2/16/21) (unpublished memorandum); *Commonwealth v. Vando*, 242 A.3d 457 (Pa.Super. 2020) (unpublished memorandum); *Commonwealth v. Nam*, 221 A.3d 301 (Pa.Super. 2019) (unpublished memorandum); *Commonwealth v. Moore*, 225 A.3d 1155 (Pa.Super. 2019)

(unpublished memorandum).[9] We find the reasoning of these cases to be more persuasive than the reasoning in **Brooks**.

In **Drummond**, this Court addressed a similar reasonable doubt instruction and held "[w]hen we view the court's medical illustration in combination with the trial court's accurate definition of the reasonable doubt standard, we do not believe there is a 'reasonable likelihood' that the jury applied the reasonable doubt standard in an unconstitutional manner." **Drummond**, 2021 WL 603244 (unpublished memorandum at 5).

In **Vando**, this Court addressed a similar reasonable doubt instruction and determined "the charge accurately informed the jury that it could find [the] [a]ppellant guilty only if it found that the Commonwealth proved the elements of the offense beyond a reasonable doubt. We do not believe there is a 'reasonable likelihood' that the jury applied the reasonable doubt standard in an unconstitutional manner." **Vando**, 242 A.3d 457 (unpublished memorandum at 7) (citation omitted).

In **Nam**, this Court addressed a nearly identical reasonable doubt instruction and determined that "when read in context of the entire instruction, the entire instruction states the law accurately." **Nam**, 221 A.3d 301 (unpublished memorandum at 6). This Court also stated the trial court

---

[9] **See** Pa.R.A.P. 126(b) (unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

"used language similar to the standard instruction both before and after using a hypothetical to explain the concept of reasonable doubt," and "[a]lthough [the court's] instruction was personalized, trial judges are granted a certain degree of latitude in their jury instructions." *Id.*

In *Moore*, this Court again analyzed a substantially similar jury instruction and found the surgery analogy part of the instruction was "at best ambiguous" as to whether it lowered or increased the degree of doubt. *Moore*, 225 A.3d 1155 (unpublished memorandum at 9). The *Moore* court determined, in viewing the medical illustration in combination with the trial court's accurate definition of the reasonable doubt standard, there was no "reasonable likelihood" that the jury applied the reasonable doubt standard in an unconstitutional manner. *Id.*

In the case *sub judice*, in addition to the excerpt set forth *supra*, the trial court offered the following reasonable doubt definition as part of its charge to the jury:

> Now, ladies and gentlemen, the very bedrock of our system of criminal justice is the presumption of innocence. Every citizen who is accused of a crime is presumed to be innocent. The mere fact that [Appellant] was arrested and charged with these crimes is not evidence of his guilt.
>
> ***
>
> Now, ladies and gentlemen, a citizen who is accused of a crime bears no burden, no burden at all. [Appellant] is not required to prove anything in his own defense….And that is because it is the Commonwealth that bears the burden of proving him guilty beyond a reasonable doubt.
>
> ***

Now, ladies and gentlemen, let's talk about this burden, the Commonwealth's burden. Proof beyond a reasonable doubt is the highest burden in the law. There is absolutely nothing greater. But that does not mean the Commonwealth is required to prove this case beyond all doubt. [The] Commonwealth is not required to meet some kind of mathematical certainty. The Commonwealth is not required to prove the impossibility of innocence. The Commonwealth's burden is proof beyond a reasonable doubt.

A reasonable doubt is the kind of doubt that would cause a reasonably careful and sensible person to pause, to hesitate, to refrain from acting upon a matter of the highest importance to the[ir] own affairs. A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence that was presented with respect to some element of each of the crimes charged.

N.T., 3/3/11, at 90-93.

We conclude the trial court accurately defined reasonable doubt, and instructed the jury that the law (1) places no duty on Appellant to prove his own defense, (2) places all responsibility on the Commonwealth to prove Appellant's guilt beyond a reasonable doubt, and (3) presumes Appellant is innocent until proved otherwise. *See Commonwealth v. Ragan*, 560 Pa. 106, 743 A.2d 390, 401 (1999) (affirming reasonable doubt instruction based, in part, on these factors).

Thus, when we view the trial court's medical illustration in combination with the trial court's accurate definition of the reasonable doubt standard, we conclude there is no "reasonable likelihood" that the jury applied the reasonable doubt standard in an unconstitutional manner. *Markman*, *supra*. Accordingly, we conclude there is no arguable merit to Appellant's claim, and trial counsel may not be deemed ineffective on this basis. *Commonwealth*

*v. Cox*, 581 Pa. 107, 863 A.2d 536 (2004) (holding trial counsel cannot be deemed ineffective for failing to object to a proper jury instruction).

In his next issue, Appellant contends trial counsel was ineffective in failing to object properly to the trial court's charge on flight.[10]  Specifically, Appellant contends the trial court erred in giving the jury an instruction on flight since there was no evidence of record to support such an instruction.

In the case *sub judice*, the trial court gave the following charge to the jury:

> Now, ladies and gentlemen, as you go through this process, you may recall that there was evidence presented that tended to show that [Appellant] knew that the police and law enforcement were looking for him with an arrest warrant.  [Appellant] turned himself in.  The arrest warrant was issued on August 13, 2008, and [Appellant] turned himself into law enforcement on September 22, 2008.
>
> The credibility, the weight and the effect of this evidence is solely for you to decide.  Generally speaking, when a crime has been committed and a person thinks that they will be accused of committing a crime and flees or conceals themselves, such flight or concealment is a circumstance tending to prove the person is conscious of guilt.  Now, such flight or concealment does not necessarily show a consciousness of guilt in every case.  A person may flee or hide for some other motive and they may do so even though innocent.  Whether the evidence in this case of flight or concealment should be looked upon as tending to prove consciousness of guilt depends upon the facts and circumstances

_____

[10] On direct appeal, Appellant contended the trial court erred in giving an instruction on flight.  **See Parker**, **supra**.  In disposing of this claim, this Court held that, although trial counsel raised an objection to the inclusion of a flight charge during the charging conference, trial counsel failed to raise a specific objection after the trial court read the charge to the jury.  **See id.** Thus, we found the challenge to the jury instruction on flight to be waived. **Id.**

of this case and upon the motives that may have prompted the flight or concealment.

You may not find [Appellant] guilty based solely on the evidence of flight or concealment.

N.T., 3/3/11, at 102-03.

Our Supreme Court has held:

A jury instruction is proper if supported by the evidence of record. This Court has held that "[w]hen a person commits a crime, knows that he is wanted therefor, and flees or conceals himself, such conduct is evidence of consciousness of guilt, and may form the basis [of a conviction] in connection with other proof from which guilt may be inferred." *Commonwealth v. Rios*, 546 Pa. 271, 684 A.2d 1025, 1035 (1996)[.]

*Commonwealth v. Clark*, 599 Pa. 204, 961 A.2d 80, 92 (2008) (citation

omitted).

Here, in rejecting Appellant's claim, the PCRA court indicated the

following:

Appellant contends that there was no evidence submitted to the jury to establish flight. At trial, the Commonwealth called Detective [Joseph] McDermott to testify. Detective McDermott testified that he served the arrest warrant at two (2) known residences of [A]ppellant, one in South Philadelphia and the other in North Philadelphia. Although Detective McDermott was unable to locate the [A]ppellant while serving these warrants, he was able to inform [A]ppellant's father that there was an arrest warrant for his son[,] [A]ppellant. N.T., 3/2/11, at 79-81. As such, the trial court found that there was "unquestionable circumstantial proof" that [A]ppellant had knowledge of the arrest warrant as this information was conveyed to his father by Detective McDermott while attempting to serve the arrest warrant. Appellant eventually turned himself in almost six (6) weeks later.

PCRA Court Opinion, filed 12/7/20, at 16. Thus, the PCRA court concluded

there was no arguable merit to Appellants' claim.

We agree with the PCRA court's sound reasoning. During the direct examination of Detective McDermott, the relevant exchange occurred between the ADA and the detective:

**[ADA]:** What is that a copy of, Detective?

**[DETECTIVE]:** The affidavit of probable cause for arrest for the defendant.

**[ADA]:** After you obtained that, can you describe for the ladies and gentlemen of the jury what you did with the arrest warrant? Did you attempt to serve it?

**[DETECTIVE]:** We did serve it. We served it at two locations: one in South Philadelphia and one in North Philadelphia.

**[ADA]:** Can you describe for the ladies and gentlemen of the jury, in serving it, did you have contact—who was the arrest warrant for?

**[DETECTIVE]:** [Appellant].

**[ADA]:** Did you have contact with [Appellant's] mother and father?

**[DETECTIVE]:** We made contact with his father.

**[ADA]:** Did you indicate to him what you had, the information that you had?

**[DETECTIVE]:** Yes.

**[ADA]:** And that you had an arrest warrant?

**[DETECTIVE]:** We did.

**[ADA]:** And can you describe for the ladies and gentlemen of the jury, were you able to locate [Appellant] on that particular day?

**[DETECTIVE]:** No, we had negative results for him.

**[ADA]:** Did you ultimately hand over a packet to your Fugitive Squad to locate him?

**[DETECTIVE]:** Yes, ma'am.

**[ADA]:** And then on September 22, it's fair to say that [Appellant] turned himself into the Sixth District?

**[DETECTIVE]:** Yes, he did.

N.T., 3/2/11, at 80-81.

- 34 -

Based on the aforementioned, we agree with the PCRA court that the trial court's flight charge was supported by evidence of record. *See Clark*, *supra*. Thus, there is no arguable merit to Appellant's claim, and trial counsel may not be deemed ineffective on this basis. *See Johnson*, *supra*, 139 A.3d at 1272 (holding counsel may not be deemed ineffective for failing to raise a meritless claim).

In his final issue, Appellant contends the cumulative impact of the multiple instances of ineffective assistance of counsel deprived him of his due process rights.

Our Supreme Court has indicated:

We have often held that "no number of failed [ ] claims may collectively warrant relief if they fail to do so individually." However, we have clarified that this principle applies to claims that fail because of lack of merit or arguable merit.   When the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed. *Commonwealth v. Perry*, 537 Pa. 385, 644 A.2d 705, 709 (1994) (a new trial may be awarded due to cumulative prejudice accrued through multiple instances of trial counsel's ineffective representation).

*Commonwealth v. Spotz*, 610 Pa. 17, 18 A.3d 244, 321 (2011) (citations and quotations omitted).

Here, we have denied most of Appellant's claims based on lack of arguable merit, and there is no basis for a claim of cumulative error with regard to these claims.  *See id.*  With regard to the few claims that we have denied based on lack of prejudice, we are satisfied there is no cumulative prejudice warranting relief.   "These claims are independent factually and

legally, with no reasonable and logical connection that would have caused the jury to assess them cumulatively." ***Id.*** Thus, Appellant is not entitled to relief on this claim.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/12/2021